**The SILL CORPORATION, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 7607.**

United States Court of Appeals
Tenth Circuit.

March 4, 1965.

Rehearing Denied April 27, 1965.

John J. Geraghty (Josiah G. Holland, Denver, Colo., William VanDercreek, Dallas, Tex., and Roland Boyd, on brief), for appellant.

Raymond N. Zagone, Washington, D. C. (Ramsey Clark, Washington, D. C., B. Andrew Potter, David A. Kline, Jr., Oklahoma City, Okl., Roger P. Marquis, Robert M. McKee, Washington, D. C., on brief), for appellee.

Before MURRAH, Chief Judge, and PHILLIPS and LEWIS, Circuit Judges.

MURRAH, Chief Judge.

The Sill Corporation, owner-sponsor of a Wherry housing project (See 63 Stat. 570, 12 U.S.C. § 1748 et seq.) appeals from a judgment on a jury verdict awarding it "just compensation" for the taking of its interest in the project. The Owner's interest was taken pursuant to the amended provisions of the Capehart Act [See 70 Stat. 1111, 42 U.S.C. (1952 ed., Supp. V), § 1594(b)], whereunder the Secretary of Defense was directed to acquire all Wherry projects where Capehart housing had been approved and constructed.[1] Under the Wherry Act, the Federal Housing Authority (FHA) was authorized to insure mortgages up to 90 percent of the estimated cost of construction. All mortgagor-owners were subject to FHA regulations in such matters as rents, charges, capital structure, rate of return and methods of operation.

See Buena Vista Homes, Inc. v. United States (CA 10), 281 F.2d 476.

The Sill Corporation was formed as a sponsor solely to take advantage of the unique economic benefits available under the Act. It constructed 500 such rental units on 122 acres of leased Government property near Ft. Sill, Oklahoma. The ground lease, drawn in 1950, was for 75 years at an annual rental of $100. It provided that title to all improvements constructed by the sponsor remained in its name for the duration of the lease, but upon expiration or termination, the improvements became the sole property of the Government, unless the sponsor elected to remove them and restore the premises. Financing of the project was accomplished by an FHA insured mortgage of $4,300,000 for 34 years from the date of its issuance in October, 1951.

Acting under authority of the amended provisions of the Capehart Act, the Government instituted these proceedings, took possession of the property and, at the same time, assumed the unpaid mortgage balance of $3,822,104.55.

On pretrial, the parties apparently agreed that capitalization of net income was an appropriate method for determining the fair market value of the Owner's interest in the project. But the parties disagreed on the factors to be taken into account in determining the net income to be capitalized. The Government took the position that fair market value was determinable by capitalizing net income after deduction of debt service, i. e., the cost of mortgage amortization and insurance. The Owner contended for capitalization of net income before deduction of debt service. Paragraph 21 of the proposed pretrial order recited that "the following methods shall be considered as proper approaches to the determination of the value of the estate being condemned:

"(a) Market data; determined by comparison with actual com-

[1]. This requirement was imposed to avoid competition between the Wherry projects and the newer Capehart projects. See 3

U.S.Code Congressional and Administrative News, p. 4551, 84th Cong., 2nd Session.

parable sales of like property prior to September 1, 1959.

"(b) Capitalization of net income before debt service.

"(c) Capitalization of net income after debt service."

The Owner first objected to paragraph 21 in its entirety, specifically complaining that subparagraph (c) was improper because it permitted the jury to choose between capitalization before or after deduction of debt service. However, the Owner finally acquiesced in the pretrial order, provided it was not restricted in any way on cross-examination to demonstrate the "mathematical fallacy" of subparagraph (c) as a principle of capitalization of income to arrive at fair market value as a measure for just compensation. A parenthetical addendum providing, "with full right of proper cross-examination covering the above approaches." was attached to subparagraph (c), and the parties proceeded to trial under the pre-trial order as a part of the trial blueprint.[2]

Upon trial to the Jury, the parties were permitted without objection to produce expert testimony of fair market value based upon their respective theories of net income for purposes of capitalization. Making application of the Government's theory of capitalization of net income or "cash flow", two appraisal experts testified that the fair market value of the estate taken was $294,000 and $302,000, respectively.[3] Applying the Owner's theory for determining net income, its four appraisers testified that the fair market value of the estate taken was $1,100,000, $1,111,000, $1,200,000 and $1,379,895, respectively.[4] Each of the appraiser-witnesses was cross-examined extensively, without let or hindrance, concerning his theory of evaluation.

Consistent with its pretrial order, the Court specifically instructed the Jury, "All of the expert witnesses for both parties have used the capitalization of income approach and all have applied this approach in one or both of the following methods of capitalization:

"The projected net income, after payment of fixed charges, all expenses, and the annual amount required by the commitment for the reserve for replacements fund, and before allowance for depreciation and debt service, which includes principal and interest payments and the mortgage insurance premium is capitalized, producing the capitalized value of the net income, and thus the indicated value of the conditional ownership in the leasehold estate. The indicated value of the equity, that is, the interest of the sponsors or defendant here as encumbered by the mortgage, is then determined by deducting from the capitalized value of the net income the unpaid balance of the mortgage.

2. Throughout the pretrial proceedings, the Owner apparently continued to object to the capitalization of net income after debt service for the purpose of evaluation of the property. Owner's counsel was apparently apprehensive lest he be precluded from developing his case on his own theories of evaluation.

3. The Government's valuation witnesses, Monrad and Sealy, calculated value after debt service. Monrad estimated net income after debt service to be $63,300, which he capitalized at 21.5 percent. His estimate of value was $302,000. The cash flow in Sealy's opinion was $68,214, which he capitalized at 14.8 percent, the product being $455,100 from which he subtracted the reserve for replacement and reached a valuation of $290,000.

4. The Owner's witnesses, Vaughan, McKean, Noah and Williamson, capitalized net income before debt service. Vaughan capitalized an estimated income of $323,785 before debt service at 6 percent for a 40-year period and then subtracted debt service, reaching a value opinion of $1,379,895. McKean capitalized $316,391 at 6¼ percent for a 50-year period, subtracted the unpaid debt, and testified to $1,111,000 as value. Noah's valuation opinion of $1,200,000 was reached by his capitalizing $319,157 by 6¼ percent over the remaining years of the lease; he then subtracted the mortgage balance leaving $1,200,000 as value. Williamson capitalized $322,297 at 6¼ percent for a 50-year period, subtracted the mortgage balance, and by that process estimated compensation at $1,100,000.

"The projected net income, after payment of fixed charges, all expenses, the required payment to the reserve for replacement, the debt service, which includes principal, interest and mortgage insurance premiums, but before any allowance for depreciation, is capitalized producing the capitalized value of the net cash flow and, therefore, the indicated capitalized value of the ownership interest which earns such net cash flow.

"You will note that the words 'indicated value' are used to define the results reached by these methods of capitalization. This 'indicated value' may or may not be the fair market value. This approach, under either method, contemplates that the seller would receive and the buyer would give the price indicated provided that the income is free and clear of further charges and free and clear of further payments other than the purchase price. If there are charges in addition to that allowed in reaching the net income before debt service, or the net income after debt service, or if there are payments required other than the purchase price, further adjustments may be required."

We must assume, of course, that the Jury understood and intelligently applied these instructions. In oral argument Owner's counsel exorted the Jury not to compromise the divergent theories on net income capitalization, but to accept one and reject the other. The Jury apparently accepted counsel's plea and, by its verdict of $302,000, obviously chose the Government's theory of net income for capitalization purposes.

The Owner now strenuously complains of that part of the Court's instructions which permitted the Jury to determine fair market value by capitalization of net income after deduction of debt service. Although the Court's instructions were submitted to the parties and suggestions solicited, neither party objected to the submission of the choice of methods for determining net income for capitalization purposes.[5] The Owner did request the Court to instruct the Jury that "payments on the principal of the mortgage indebtedness * * * are not an expense item and to treat them as such would improperly reduce the evaluation." It is not entirely clear whether this request was intended to challenge the Court's instructions on choice of capitalization theories. If so, we seriously doubt whether it meets the requirements of Rule 51, F.R.Civ.P. See Downie v. Powers, 9 Cir., 193 F.2d 760. But, even so, we think the challenge comes too late in view of the apparent pretrial agreement of the parties on the blueprint of the lawsuit embodying their respective theories of income capitalization and the introduction without objection of testimony in support of those respective theories. No one should be heard to object to an instruction on the law of the case on which it was tried and submitted by agreement of the parties. We ought

---

5. When the parties came to discuss the Court's proposed instructions in an In Chambers Conference, counsel for the Owner objected to the first and second paragraphs on page 22 of the Government's requested instructions (Instruction 17 on capitalization of net income). The ensuing colloquy plainly indicates that counsel was objecting to the Court's treatment of the "reserve fund for replacement". The burden of the objection was that the instruction on this point constituted an unwarranted "comment on evidence on which conflicting views had been expressed by the witnesses" that "The Court would in effect be directing a verdict on a point in issue". The ground for objection to the second paragraph of the instruction was that it conflicted "with the basic concept of market value because it must assume that the property could be sold on the open market". The Court took the matter under advisement as one of the "two points that I am to consider a while longer". There were no objections to the submission of the choice of methods for determination of income for capitalization purposes, also included in Requested Instruction 17. The Court instructed the Jury on choice of theories of net income in accordance with the pretrial order. When at the conclusion of argument and before the case was submitted to the Jury, counsel was asked for further objections to the instructions, the Owner's counsel responded that he had none other than those "we recorded this morning."

not to disturb the Jury's verdict unless we are convinced that it is made to rest upon a palpably erroneous rule of capitalization used to measure fair market value for the purposes of just compensation.

 We know, of course, that the law is not wedded to any particular formula or method for determining fair market value as the measure of just compensation. See: United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336; and United States of America v. Sowards et al. (10 C.A.), 339 F.2d 401. It may be based upon comparable sales, reproduction costs, capitalization of net income, or an interaction of these determinants. The parties agreed in this case that the capitalization of income is the most satisfactory method. The parties also agree, as they must, that the test of fair market value is the amount of money a willing buyer would pay for the future net income, when computed at its present value.

It is indeed unfortunate that the divergent theories of income capitalization on which this case was submitted to the Jury inevitably result in a wide disparity on the amount of money a willing buyer would pay for income producing property. Under the two theories, a willing buyer would pay $1,000,000, or $300,000, depending upon which appraiser he happened to employ and rely upon.[6] Both theories have, nonetheless, been approved in adjudicated cases. Capitalization after deduction of debt service was approved in Likins-Foster Monterey Corporation v. United States, 9 Cir., 308 F.2d 595. It was apparently used and approved in United States v. Tampa Bay Garden Apartments, Inc., 294 F.2d 598. The Owner says it was disapproved in De-Luz Homes v. County of San Diego, 45 Cal.2d 546, 290 P.2d 544, a case involving

---

**6.** The Government contends that debt service must be subtracted from income before capitalization because this is the only manner in which equity income would be considered by prudent buyers and sellers of equity investments. See: Kaffenberger, "Market Data in the Appraisal of Income Property", The Appraisal Journal 57–62 (1960). And, that a buyer would only be interested in what income he would receive on his investment after all expenses, including debt service, had been deducted. It argues that in the final analysis this technique is a closer approximation of what investors would consider the value of the sponsor's interest, than the formula relied upon by the Owner where debt service has little or nothing to do with determining value. The Owner contends that capitalization of income after deduction of debt service is wholly inadmissible because it allows the amount of the mortgage to control the value of the property. In other words, the payment of the mortgage has been a use of net income rather than an element which determines net income; thus, the over-all value of the Wherry project should be computed before deduction of the mortgage debt, the amount of the outstanding mortgage then being subtracted in determining the sum due to the owner as just compensation.

There are statements in text on appraising income property to the effect that "when determining net income for the purpose of appraisal, amortization of mortgage or any interest paid are to be disregarded. This becomes clear if one can conceive of a property whose entire earnings are being paid out in interest and amortization of a mortgage." Real Estate Principles and Practice by Maurice A. Unger (South-Western Publishing Co. 1954). The fallacy of this argument may lie in the fact that the only interest taken here is a possessory right in a lease. This reasoning would be applicable if the owner in this case acquired an equity through the amortization of the mortgage. The mortgage payments, although commensurate with the income, would nevertheless operate to enhance his equity in the property. But, in our case, the owner can acquire no equity in the mortgaged property. The nature of his estate therein is purely possessory—the right to the income or the benefits, after discharge of all of the burdens. When the mortgage indebtedness is finally satisfied, the Owner does have a residual right in the leasehold with a right to remove the improvements, but if they are not removed, they become the property of the Government and no one here contends that this was considered as a factor in determining whether the debt service should be deducted before or after capitalization.

a fair market value of a Wherry project for purposes of ad valorem taxes. Capitalization before deduction of debt service was used with approval in United States v. Certain Interests in Property, D.C., 205 F.Supp. 745; and United States v. Certain Interests in Property, 7 Cir., 271 F.2d 379.

■ In this state of the law and in this posture of our lawsuit, we cannot say that either theory of income capitalization is so palpably erroneous as to be legally inadmissible.

It is agreed that one of the principal keys in the capitalization of income process is determination of the capitalization rate, i. e., that percentage which will provide for the recapture or amortization of the value of the investment in the improvements, plus a reasonable and proper rate of return to the investor. This is true, of course, whether the income to be capitalized is calculated before or after the deduction of debt service. The owner objects to the use of comparable Wherry Project sales as a factor in the determination of the capitalization rate.

■ The determination of the capitalization rate entails consideration of many risk factors which may influence a prospective purchaser in determining fair market value. In our case, the Government witnesses and at least one of the Owner's witnesses considered sales of stock in other Wherry housing corporations as comparable for the sole and only purpose of arriving at an appropriate capitalization rate. The Jury was instructed in accordance with the pretrial order that, "To the extent that other properties or investments are actually similar or comparable to the property involved in this action from the viewpoint of the quantity and quality of the income stream and the limitations and risks attendant thereto, the capitalization rates, multipliers and income-price ratios resulting from these transactions are the highest and best evidence of the proper capitalization rate, multiplier or income-price ratio to be applied in the capitalization of the projected income of this project." As we interpret this instruction, it is simply to the effect that comparable sales of Wherry projects to the extent that they are comparable is relevant evidence in determining the capitalization rate.

Case authority appears to clearly favor the trial court's instruction on this issue. The most recent and comprehensive discussion of the matter is found in United States v. Certain Interests in Property, 326 F.2d 109. There the Second Circuit held that the admission of evidence of comparable sales for the sole purpose of establishing the ratio between income and sale price was entirely within the discretion of the trial court. See also: United States v. Delano Park Homes, Inc., 2 Cir., 146 F.2d 473; United States v. Tampa Bay Garden Apartments, Inc., supra; United States v. Johnson, 9 Cir., 285 F.2d 35; United States v. Certain Interests in Property, D.C., 186 F.Supp. 167, aff'd sub nom.; and Likens-Foster Monterey Corp. v. United States, supra.

The principal case relied upon by the Owner is United States v. 190.71 Acres of Land, 7 Cir., 300 F.2d 52, where the appellate court upheld the trial court's rejection of comparable sales as direct proof of value, not to determine capitalization rate.

■ The Owner also objects to the deduction of the reserve for replacement fund from the amount of just compensation. Wherry leases require the lessee to make annual contributions to a replacement fund, to insure that necessary replacements, such as stoves and refrigerators will be made. The Government had assumed the obligation of replacement, and the replacement fund, which then amounted to approximately $167,310, was refunded to the Owner. In reaching his final estimate of fair market value, one of the Government's appraisal experts deducted the replacement fund from his estimate of capitalized net income. The Owner objected to the instruction given by the Court relating to the replacement fund, which in effect left open the question of whether the deduction was

proper.[7] The Owner relies on Buena Vista Homes, Inc. v. United States, supra, and United States v. Certain Interests in Borough of Brooklyn (Fort Hamilton), 326 F.2d 109. We think Judge Breitenstein answered the question against the contention of the Owner in Buena Vista Homes, Inc., when he stated that, "In fact, the fund was not available to the condemnor as it had been returned to Buena Vista. Accordingly, the entire repair and replacement cost had to be deducted from the capitalization of income figure to arrive at the fair market value." ibid., 281 F.2d p. 480.

Here, as in Buena Vista, there was testimony to the effect that the condition of the property required repair, and in deducting this amount for the capitalization of income, the expert witness assumed that the accrued replacement fund would not be available for that purpose. In these circumstances it was not improper to permit the Jury to consider this testimony in determining fair market value. On pretrial the Court excluded evidence of reproduction costs as not being an acceptable basis of evaluation, and the Owner complains of it here. Judge Breitenstein also answered this question in Buena Vista, holding that "the condemnee's rights with respect to the property were limited by the fact that the projects were subject to rent control by Federal Housing Administration and the consistent policy in regard to such projects had been the allowance of a return based on original cost rather than reproduction cost." ibid., 281 F.2d p. 478.

Finally, we come to the asserted reversible error in the ruling of the Court on admissibility of evidence of excess mortgage proceeds and its characterization as a "windfall" in the testimony of witnesses and the Government's argument to the Jury on this point. From the very outset of the pretrial proceedings, the Owner apparently realized the detrimental effect of any reference to excess mortgage proceeds over the certified cost of construction, and particularly its characterization as a "windfall". The pretrial order provided that, "Neither counsel nor any witness for either party shall, in the presence or hearing of the jury, use the word 'windfall' in the trial of this case unless approval is obtained in advance from the court; however, the words 'excess mortgage proceeds' may be used." The pretrial order also provided that 'Evidence of the actual cost of construction shall be admitted * * *,' solely as evidence as to what a willing, prudent buyer and seller would contemplate or expect in the way of income or rental ceilings in the future under the authority of the Commissioner to regulate and restrict the rentals."

At the time the loan was made, the excess mortgage proceeds over the actual cost of construction could not rightly be called a "windfall". Rather, it constitut-

---

7. The trial court specifically instructed the Jury that, "the defendant was required to establish and maintain with the mortgagee, as escrow agent, a reserve fund for the replacement of short lived items, such as stoves, refrigerators, hot water heaters, and so forth, by depositing in said fund in monthly installments the annual amount of $27,115. At the date of taking the accumulated amount in the reserve fund was $167,316. By agreement between the Commissioner of the Federal Housing Administration, the Department of the Army, and the mortgagee the total amount of this accrued fund was turned over to the defendant at or about the time of taking. "You are instructed that the obligation to deposit this annual amount was a contractual one and binding upon the defendant for the term of the lease. No withdrawals could be made from that fund without the prior approval of the Commissioner of the Federal Housing Administration during the term of the Federal Housing Administration insured mortgage. None of the expert witnesses were entitled to assume that the terms of these contractual obligations could be varied by the defendant or his purchaser or successor in interest.
"* * *
"You may consider this testimony and its effect, favorable or unfavorable, on the fair market value of the rights acquired by these proceedings and give it such weight and such effect you deem justified."

ed money, the use of which inured to the Owner only during the amortization period of the mortgage. When, however, the Government took the property, assumed the indebtedness and refunded the replacement funds to Sill, the excess mortgage proceeds inured to the Owner without any obligation to repay them. These funds thereupon became an unexpected gain and a "windfall", if you please.

The word "windfall" is not opprobrious if properly used, but even so, its use should not be permitted to mislead, deceive or prejudice the Jury's consideration of value as a measure of just compensation.

The term "excess mortgage proceeds" or "windfall" first crept into the trial of the case during the testimony of one of the Owner's appraiser-witnesses. He was being examined concerning the probability of the necessity for a rental increase in the future, to off-set the increased operating expenses in order to maintain the level of capitalized net income. The witness recognized the contingency of a rate increase based upon increased operating expenses and the vacancy factor. He was then asked if he was aware of FHA policy to the effect that in the event of excess mortgage proceeds, such excess was taken into consideration in the exercise of the FHA's contractual right to "fix rates and charges." The witness testified that he was aware that this supposed FHA policy was a controversial point, but didn't know just what the FHA was doing about it. Whereupon, the Government then sought to question the witness concerning certain letters purporting to set forth FHA policy on all military housing, to the effect that the excess mortgage proceeds, if any, would be taken into consideration in processing applications for rent increases. The word "windfall" was freely used in these letters to characterize the receipt of mortgage proceeds in excess of the cost of construction of a federal housing project. When Government's counsel read from one of the letters, using the word "windfall clearance", counsel for the Owner objected, and the Court instructed the Jury to disregard the word "windfall" as being inadvertently used by Government's counsel. Government's counsel answered that while he was cognizant of the provisions of the pretrial order in that regard, he did not interpret it to exclude use of the word "windfall" where it appeared in documentary evidence. He was instructed to henceforth use the term "excess mortgage proceeds" wherever the word "windfall" appeared in the documents. At one point, Government's counsel again used the term "in the event of windfall settlement agreement" and was admonished not to do it anymore.

The following day and outside the hearing of the Jury, the Court stated that when on pretrial it had ordered the word "windfall" not be used, it was not aware that the word would be contained in the FHA letters, documents and policies admitted in evidence; and, in view of the fact that the word did appear in these letters, which had been admitted in evidence, the pretrial order could not be adhered to without changing the wording of the exhibits which, of course, the Court could not do. "So," said the Court, "I am changing the pretrial order and leaving that part out which states that 'windfall' will not be used." The Owner took exception, and Government counsel then said that "the spirit of the pretrial order will still be followed * * *" and that "I will attempt at all times to use 'excess mortgage proceeds', but sometimes it is possible that maybe we can't without changing the letter."

Thereafter, during the trial of the case, the Government's witness-appraisers testified in effect that the Government's policy, as evidenced by the letters introduced in evidence, was relevant to the risk factor or multiplier for determining rate of return. One of the owner-appraisers said that this policy caused him to lower his rate of return from 7 percent to 6.67 percent. It was in this vein that excess mortgage proceeds was referred to in connection with FHA policy on requests for increased rentals.

During examination of one of the Government's witnesses on FHA policy with

respect to excess mortgage proceeds, the witness was permitted to testify to FHA's concern with the "congressional investigation relative to the designation of 'windfalls'." Counsel interrupted to inquire if he understood windfall and excess mortgage proceeds to be substantially the same. He replied that they were "synonymous"; that he preferred to use "excess mortgage proceeds" but that the term "windfall" had "gotten into such common usage that I almost automatically use that term for identification." And, it is true that Congress subsequently enacted "anti-windfall" legislation.

The Owner strenuously contends that the FHA policy letters should not have been admitted in evidence because the letters were not promulgated in compliance with the Federal Register or Federal Administrative Procedure Act, and did not, therefore, rise to the dignity of an administrative regulation. The Government concedes this and says that they were not offered as having the "force and effect of law", but they were, nevertheless, relevant to the risk factor in arriving at a rate of return. Under the lease contract, the FHA, as we have seen, was empowered to regulate rates, charges, capital structure, rate of returns, and methods of operations, and it was certainly relevant for a prospective purchaser to know that in the event increased rentals were needed in order to maintain the level of capitalized income, the FHA would invoke its policy in the face of excess mortgage proceeds. This was the extent to which the excess mortgage proceeds and windfall was used in the Government's case, and it was not irrelevant for that purpose.

■ In the circumstances of this case, it was not improper for the trial Court to relax the pretrial order to permit reference to the windfall as it was used in the documentary evidence. Pretrial orders are, to be sure, blueprints for the trial which ought not to be relaxed in the absence of good cause, but they are not hoops of steel and may always be modified in the interest of the administration of justice.

The question remains whether reference to the excess mortgage proceeds and windfall in Government counsel's closing argument was so fundamentally prejudicial as to warrant notice of it here when it was not objected to at trial. In the course of his argument one Government counsel referred to the $365,000 of excess mortgage proceeds and stated, "Well, sure ladies and gentlemen, they ought to have a profit, but I'm telling you, $365,000 plus income for five or six years, plus $167,000 in the reserve for replacement that they got, plus what they are claiming here now is over $1,000,000. I say that's a pretty fair profit; and I think if this profit is increased only by $290,000 to $302,000, you've got pretty fair profit".

Another Government attorney mentioned the "excess mortgage proceeds or windfall" in his argument. In his closing argument counsel for the Owner met the issue squarely and defended the receipt of the proceeds as compensation for the risk involved with the argument that the excess mortgage proceeds had nothing to do with value, and reference to them as a windfall was a "ghost" which had been killed by the Government's own star witness.[8]

■ Counsel may, of course, respond to argument without risk of later being estopped from complaining of it as re-

---

8. "Well, let's look at the windfall. He has just referred to it. He has counted that, he has counted the profit and set before you a vast sum of money as being that which these people now have, which they have derived for nothing. That is not true.

"They worked for it. They risked half a million dollars. He says they had contracts signed. That is pure specula-

tion on his part. There is no evidence on it.

"But let's get to the meat of it. As this case developed, I am certain that you were led to believe that this was something that really affected value. It was going to cause value to go down.

"How? By the devious, circuitous route, not that anybody was entitled to recover that, to take it away from the Sill Corporation, but sometime in the

versible error. But the response does serve to put the whole matter in its proper perspective for appraisal of its prejudicial effect on the jury.

 The Supreme Court has laid down the ground rules to govern representatives of the Government in presenting its case to a jury. It is said that Government's counsel "may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Viereck v. United States, 318 U.S. 236, 248, 63 S.Ct. 561, 567, 87 L.Ed. 734. McManaman v. United States (10 CA) 327 F.2d 21.

 And, it is the responsibility of the trial judge, as the governor of the trial, to see to it that counsel remain within the bounds of the record on oral argument—that they strike no foul blows. It ought not be incumbent upon counsel to interrupt the argument. The Court ought to take the initiative where counsel is plainly inflammatory. See: New York Central R. R. Co. v. Johnson, 279 U.S. 310, 49 S.Ct. 300, 73 L.Ed. 706. We have followed the established rule to the effect that the " * * * [appellate] courts will correct error in rare instances where it appears that a verdict was the result of passion aroused through extreme argument which clearly stirred the resentment and aroused the prejudice of the jury even though no objection was made or exception taken at the time." See: Metropolitan Life Ins. Co. v. Banion, 10 Cir., 106 F.2d 561. Also see: Smith v. Welch (10 CA), 189 F.2d 832.

It is evident that from the very beginning the Court was concerned with the prejudicial effect of the excess mortgage proceeds when characterized as a windfall. At one point in the pretrial, while the word "windfall" was under discussion, the Court addressed Government's counsel saying, "Do you have any authority that permits you to go to the jury with the story about windfalls?" and then said, "I'm talking about the Court making an error letting it in to prejudice the jury against these defendants." and, again, "Well, here's the point. If you want to use the 'windfall' for an advantage with the jury, the Court doesn't want you to use it." The trial court adhered to the pretrial plan to preclude reference to the word "windfall", until it appeared as accepted terminology in the documentary evidence. It was only then that the pretrial rule was relaxed to permit its use, and we think properly so.

 In weighing the propriety of reference to the term on oral argument,

future it might become necessary to request a rental increase and when that request was made—I don't even know how much it was going to be for, that's a guess—but when it was going to be made, FHA would reject it. FHA doesn't reject these in whole. Sometimes it's in part.

"But let's say it's to be rejected in whole. What then does that have to do with value in this case? Wouldn't we like to know what effect it would have on the value of this property as of the date of taking?

"Ladies and gentlemen, you were told, you were told by a witness no less than Mr. Sealy, you will recall when I stood there at the podium and talked with Mr. Sealy, I asked him the question, what would have been the effect upon your opinion of value if as you believe there had not been a windfall?

"And what did he say? He said that instead of using that multiplier of 6.67, he would have used a higher multiplier, thereby giving a greater value. He would have used a multiplier of 7. The difference between the two is decimal 33.

"You take decimal 33, multiply your equity income, $68,241, and ladies and gentlemen, this ghost, this tremendous burden, this penalty—what does it amount to? Believe this if you will, go through that multiplication and we are talking about $22,519.

"What is that per unit? $45.04.

"If this is something that does reduce it, this is something that might reduce it, if a rent request were made and if it were rejected—when, for how much and with what result, we don't know.

"Ladies and gentlemen, Mr. Sealy, the Government's star witness, killed that ghost. It's out of this case. It's dead and gone."

it is significant, we think, that after all, the excess mortgage proceeds did prove to be a windfall and, as such, it was not wholly irrelevant to the ultimate issue of just compensation. The Owner did receive the $167,000 representing the replacement fund, and the receipt of this sum, as we have seen, was relevant to the critical issue. Then, too, it is noteworthy that the issue squarely presented to the Jury by the Owner's oral argument was whether it would accept the Government's appraisal based on its theory of capitalization of income or the appraisal of the Owner based upon its theory. In this setting, we do not think it wholly improper for Government counsel to call attention to the amount of money the Owner had already received in determining which of the divergent theories the Jury would choose in awarding "just compensation".

It may well be that reference to the receipt of these funds was over-emphasized, but we cannot say that it was so violent and perversive as to defeat the ends of justice.

The judgment is affirmed.