THE STATE OF MONTANA ACTING BY AND THROUGH THE STATE HIGHWAY COMMISSION OF THE STATE OF MONTANA, PLAINTIFF AND RESPONDENT, v. ROBERT D. TUBBS AND JANE DOE TUBBS, HUSBAND AND WIFE, OR AS A SINGLE MAN, DEFENDANTS AND APPELLANTS.

No. 11031.
Submitted January 12, 1966. Decided March 1, 1966.
Rehearing denied March 18, 1966.
411 P.2d 739.

Garlington, Lohn & Robinson, J. C. Garlington (argued), Missoula, for appellants.

Rupert C. Schneider (argued), Helena, for respondents.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This case is another chapter of a growing volume, in the history of Interstate Highway 90, traversing Montana east and west. In condemnation proceedings, defendant-appellant, Robert D. Tubbs, was awarded $8,000 by the jury in the Fourth Judicial District Court, Missoula County, the Honorable E. Gardner Brownlee, presiding judge.

The condemned property was a fifty to sixty year old house situated on the rear portion of a sixty-foot corner lot, immediately behind the Northern Pacific Hospital in Missoula, just one block east of the underpass by which traffic from the downtown area reaches the north side of Missoula. The house, formerly a family dwelling, had been remodeled into three efficiency apartments on the ground floor, and an unfinished unit upstairs. The two units which shared a common bathroom had rented for $25 per month each; the one unit with its own bathroom had rented for $30 per month. Mr. Tubbs testified

that these units could have been rented each for $5 more per month, but that he had lowered the rent to accommodate his elderly tenants. With destruction imminent to make way for the highway, the apartments failed to attract renters, although testimony was given that the house remained sound and the location behind the hospital always had a demand for rental housing. After the rentability of the property decreased, Tubbs ceased to keep it in good condition.

As an approach to determine the value of the property, Mr. Tubbs hired a competent contractor to make a detailed reproduction cost of the structure and of what work and materials would be necessary to put it in reasonable rental condition. By subcontracting the cost to renew the property, which would put it in rental condition, from the cost to build completely a similar structure new, it is Tubbs' position that the appraisal method known as "reconstruction cost less depreciation" was satisfied, and, therefore, that these figures became admissible as evidence of the value of the property. The State, however, objected to the figures arrived at in this manner, suggesting that due to the nature of the property, considering the age and condition of the house, no proper evaluation of depreciation could be ascertained, and that these figures to be offered by Mr. Tubbs' contractor did not specify or clearly show what allowance was being made for the extensive depreciation of the subject. The court sustained the objection and barred the evidence. That ruling is cited as error on this appeal.

Mr. Tubbs argues that these figures reached in his reconstruction cost appraisal are competent evidence on the question of fair market value "when there is not a clear pattern of market data from similar property sales," which he claims the evidence of the State's appraiser failed to show. On cross-examination, the State's appraiser testified that he had considered several approaches in arriving at what he considered the true value of the property—$1,700 for the land and $4,300 for the improvements. He had rejected the "reproduction cost less

depreciation" method because he "felt that on an improvement such as existed on the property, that it would not give any proper indication of value." He did not know where he "could possibly come up with the proper measure of the depreciation on a structure such as we have here." On re-direct examination, he stated that "the reason I didn't use it, one could arrive at the reproduction cost, but we have a two-fold problem on the depreciation. We had the wearing out of this building, which is, in my opinion, some 50 to 60 years of age, plus we have the functional problem that apartments just aren't built this way any more. People, through the years, demand that different things (go) in their apartments, and to measure this functional problem would be virtually impossible, and this is the thing that I felt couldn't be done."

The State's appraiser also rejected the rental return approach in determining value, stating that in his opinion it produced a figure that was "just too low."

In reaching his final conclusion of value, he "relied on the market data approach as the best indication of value." The record shows that he used lot sales on the north side of Missoula and sales in other parts of the city of structures similar in age, condition and use. He said, "Well, the thing I was looking for was some type of property that was as closely similar to Mr. Tubbs' property, and as I previously stated, there just isn't this type of evidence available right there in the immediate area, and this is why I went into the East Rattlesnake, which I felt was a fairly comparable neighborhood, catering to the same type of people, and this is why I went down to South Second West, where I felt again we had a similar type of neighborhood, these offering pretty much the same environments as one would find the area of Mr. Tubbs' property."

The court in its instruction six told the jury: "You are instructed that you may not award compensation in excess of the amount specified in the answer of the defendant, which amount is $15,000; nor may your verdict be less than the sum of $5,975,

the amount presented in the testimony by the State of Montana, in this matter.

"The burdèn of proof is upon the defendant (Mr. Tubbs) to prove (he) is entitled to an amount greater than $5,975, the amount presented in testimony by the State in this matter; the State of Montana is not obligated to assume such burden of proof."

Appellant's specifications of error are:

1. The court erred in sustaining the State's objection to the testimony as to what would be the cost of constructing the Tubbs' house in essentially its then form.

2. The court erred in denying and excluding the estimate of the cost of reconstructing the Tubbs' property and putting it into rental condition.

3. The court erred in denying the Defendant's motion for a new trial.

Mr. Tubbs' witnesses had given as their opinions that the fair market value of the property ranged from $15,000 to $16,000. These opinions were allowed over strenuous objection by counsel for the State on grounds that comparisons were being made with non-comparable or even similar properties, that these witnesses had based their opinions partly on their knowledge of other sales made to the State, and that these negotiated settlements had no relationship to fair market value of the disputed property, the figure sought in this condemnation proceeding. The allowance of this evidence by Tubbs' witnesses is raised as a cross-assignment of error. The State argues that if error were made in excluding the offer by Mr. Tubbs of his figures on reconstruction cost, that error was offset by the error in allowing these opinions based on negotiated sales, citing our compensable error statute, section 93-8023, R.C.M.1947, which in applicable part states "no cause shall be reversed upon appeal by reason of any error committed by the trial court against the appellant, where the record shows that the same result would have been attained had such trial court not committed an error or errors

against the respondent." It is our decision that the appellant's specifications of error do not provide adequate grounds for a reversal, thus, it is not necessary for us to answer respondent's cross-assignment of error.

The issue posed by appellant on the admissibility of his "reconstruction cost" figures is simply a facet of the larger and more universal problem in all eminent domain litigation, that being: what evidence on the question of value of the condemned property should be given to the jury? The question of value has its roots in the constitutional requirement that "[p]rivate property shall not be taken or damaged for public use without just compensation" to the owner. Art. III, § 14, Mont.Const. Courts through the years have been especially sensitive to the duty of "protecting every many in the possession of his own" when "the urgency of so-called public improvements rest as a constant menace upon the sacredness of private property." McElroy v. Kansas City, 8 Cir., 21 F. 257 at 260. We recognize that "just compensation" is often difficult to measure with any degree of consensus between the condemnor and condemnee, and that no one formula or method of measurement universally applies to all cases. But, of equal importance, we have recognized under our statutory law that the "justness" of the compensation is to be measured by the "actual value" of the property at the date of the service of summons. Section 93-9913, R.C.M.1947. When there is a market for the type of property in litigation, and when there is no element of intrinsic worth or special value which needs to be taken into account in ascertaining "actual value," we have followed the principle of fair market value, which is nothing more or less than that price resulting from fair negotiations between a seller willing to sell and a buyer desiring to buy. State Highway Comm'n v. Peterson, 134 Mont. 52, 328 P.2d 617; State v. Lee, 103 Mont. 482, 63 P.2d 135. Market value is the basic criterion and is the ultimate criterion when a market does, in fact, exist. Bond v. State, 24 A.D.2d 778, 263 N.Y.S.2d 732.

But, as we have stated, no iron-clad rule can universally be

applied in all cases arising from the State's condemnation power in ascertaining the fair market value of certain property. Each case must be determined on the basis of its own special circumstances as they are revealed in the testimony. We agree with the United States Court of Appeals, Tenth Circuit, that "the law is not wedded to any particular formula or method for determining fair market value as the measure of just compensation. See: United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336; and United States of America v. Sowards, (U.S.C.A. 10th Cir. 1964), 339 F.2d 401. It may be based upon comparable sales, reproduction costs, capitalization of net income, or an interaction of these determinants." Sill Corp. v. United States, (U.S.C.A. 10th Cir. 1965), 343 F.2d 411 at 416.

Mr. Justice Castles, writing for the court in State Highway Comm'n v. Peterson, supra, 134 Mont. at page 64, 328 P.2d at page 624, suggested that if "improvements on the property enhance the market value then the value of those improvements is material" in the determination of the total fair market value of all the condemned property. "The true rule," Justice Castles stated, "seems to be, for the witness to testify as to the nature of the improvements, their use, and then, probably, state that the improvements enhance the market value of the land. He may then testify as to the consideration of the improvements and their condition and value at the time of the condemnation.* * *

█ "This evidence is not received as independent evidence of value; it is received simply as evidence reflecting upon market value, and from it that final fact, with the other evidence introduced, may be found. [Citing authorities.]" It thus becomes the duty of the trial judge to determine whether offered evidence competently relates to the fair market value of the condemned property, and he must with care and caution determine the admissibility of the evidence in light of the special circumstances of the case.

■ One of the most reliable tests as to evidence on the question of fair market value of course is that of comparable sales. See Jahr, Eminent Domain, c. XXI, pp. 209-224; Heaney, Valuation of Property for Highways Under Eminent Domain, pp. 45-48; 1 Orgel, Valuation Under Eminent Domain, c. XII, pp. 581-628; 5 Nichols on Eminent Domain, pp. 408-498. It is, however, only when "exchanges of similar property have been frequent, the inference is strong that the equivalent arrived at by the haggling of the market would probably have been offered and accepted, and it is thus that the 'market price' becomes so important a standard of reference. But when the property is of a kind seldom exchanged, it has no 'market price,' and then recourse must be had to other means of ascertaining value, including even value to the owner as indicative of value to other potential owners enjoying the same rights." Kimball Laundry Co. v. United States, 338 U.S. 1, 6, 69 S.Ct. 1434, 1438, 93 L.Ed. 1765.

■■ We note from the record here that evidence of comparable sales is indeed scanty. It is difficult precisely to determine what kind of market prevailed in Missoula for property of the kind and type Mr. Tubbs owned. But, we also note that when Mr. Tubbs made his offer of value, based upon the reconstruction cost less the renewal cost figures of his contractor, those figures were lacking a proper reflection of the depreciation of the structure. Therefore, the objection to their admission was properly sustained. It is an accepted principle that whenever cost of reproduction is considered in the determination of value, a proper deduction must be made for depreciation as an important factor legitimately affecting the limits of value. "It has come to be recognized that, in addition to depreciation in the form of structural depreciation resulting from wear and tear and other sources of physical deterioration, the element of depreciation usually referred to as functional depreciation frequently affects value because of obsolescence of the property or its loss of adaptability." Moss v. New Haven Redevelopments Agency, 146 Conn. 421, 151 A.2d 693.

This house was 50 to 60 years old, a former family dwelling converted into apartments; it was in a state of considerable disrepair at the time of these proceedings, and it is beyond doubt that if a new structure were to be reproduced on the lot serving the same function, many changes would be made to assure that it met modern building standards. We cannot close our eyes to the fact that houses are not built the same today as they were 50 to 60 years ago. Furthermore, there is no basis for saying, by any method or procedure of accounting of which we are aware, that the depreciation of this structure is equal to the cost to renew it in making it rentable. Depreciation is a decline in the value of property caused by wear or obsolescence, (see Webster's New Collegiate Dictionary), and is usually measured by a set formula which reflects these elements over a given period of the useful life of the property. There is no showing that this evidence offered by Mr. Tubbs took into consideration a proper accounting for depreciation.

The jury determined the value of this property on the basis of the evidence which was produced for their consideration. The appellant cannot now be heard to say that they did not return an award equal to what he considered the property to be worth and that they may have given him more if he had properly submitted an appraisal of this property based on its reconstruction cost less depreciation.

It is our view that the trial court properly denied appellant's motion for a new trial.

We affirm the judgment.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES DOYLE and ADAIR concur.

MR. JUSTICE CASTLES deemed himself disqualified to participate in the decision herein and therefore takes no part in this Opinion.