Representative Jeanne Faatz Chairman Representative Jack McCroskey Representative James Reeves Legislative Committee on RTD Oversight Room 46 State Capitol Building Denver, Colorado 80203
Dear Representatives Faatz, McCroskey and Reeves:
I am responding to your letter dated December 3, 1981, requesting my opinion on several questions regarding agreements between the Regional Transportation District ("RTD") and John W. Galbreath 
Co. ("Developer") for development of the block bounded by Broadway, 16th Street, Lincoln and Colfax Avenue. In preparing this opinion we have reviewed the development and lease option agreement dated February 4, 1981, executed by RTD and the developer (the "development agreement") and exhibit A to that agreement, which is an unexecuted lease of air rights (the "lease"). We are informed by RTD that the lease which we reviewed is the currently effective version and contains several amendments to the original lease. We have not reviewed exhibit A to the lease, which is to be a plot plan describing the limits and planes of the property leased to developer and the property retained for use by RTD, nor exhibit B to the lease, which is to be a description of certain easements granted to the developer. It is my understanding that these exhibits have not yet been finalized.
As you know, the agreements contemplate an arrangement whereby developer will construct an office building above portions of an RTD transit facility. RTD will include in its construction of the transit facility the columns, supports, foundations and utilities necessary for the office building. At the present time, the developer has not made a binding commitment to enter into the lease. If the developer chooses to do so, the lease requires payment to RTD of (1) a minimum rent ranging from $100,000 to $400,000 per year and (2) a "cash flow" participation payment determined in accordance with a formula set forth in the lease. Several of your questions relate to the cash flow participation formula.
I will address your questions in the order presented in your letter. To avoid a lengthy opinion, I have quoted portions of the agreements only when necessary.
The following general principles have guided our review of the agreements. Leases, like other contracts, are to be interpreted so as to effectuate the intent of the parties as expressed in the document. Ruston v. Centennial Real Estate InvestmentCo., 166 Colo. 377, 445 P.2d 64 (1968). A court first looks to the language of the contract and, if it is clear, interprets the language in accordance with its plain meaning. DenverPlastics, Inc. v. Snyder, 160 Colo. 232, 416 P.2d 370
(1966); Tumbarello v. Byers, 37 Colo. App. 61, 543 P.2d 1278
(1975). However, if there are ambiguities in the language or the instrument is incomplete, the court may take additional evidence in order to determine what the parties intended.Leach v. LaGuardia, 163 Colo. 225, 429 P.2d 623 (1967);American Mining Co. v. Himrod-Kimball Mines Co.,124 Colo. 186, 235 P.2d 804 (1951).
With these general principles in mind, my conclusions are set forth below. This opinion contains our legal opinion on the questions asked in your letter and should not be construed as an opinion on the financial or policy considerations of the arrangements between RTD and the developer.
QUESTIONS PRESENTED AND CONCLUSIONS
1. Is RTD's participation in cash flow subordinate to the payment of principal on the original debt financing of the office building?
 My conclusion is "yes." RTD's participation in cash flow, as defined in the lease, occurs after certain amounts related to debt service (including both principal and interest) have been subtracted from "net income" derived from the project.
2. Will the profits from refinancing or sale of the leasehold be available for cash flow participation by RTD?
 My conclusion is "no." The cash flow formula specifically excludes such profits from the definition of net income.
3. Under the terms of the lease, does RTD have the right to disapprove assignments of the leasehold by tenant? Will developer remain secondarily liable for performance of tenant's obligations under the lease after such an assignment?
 My conclusion is that RTD has no legal right to disapprove assignments of the lease, which occur after completion of the office building. Developer will not be secondarily liable after such an assignment.
4. Does section XVII of the lease give RTD the right to approve, reject, or in any way limit the amount, timing, or terms of payment of any loan for which the office building or the leasehold estate serves as collateral?
My conclusion is "no."
5. Could the tenant establish an initially high debt service deduction, followed by a refinancing based on equity participation in the project, that would have the effect decreasing the participation of RTD in cash flow?
 My conclusion is that such an agreement does not appear to be prohibited by section III D of the lease, although the question is not free from doubt.
6. Does the lease preclude tenant from managing expenses in a way that reduced cash flow available for participation by RTD?
My conclusion is "yes," within certain parameters.
7. Apart from the potential for participation in cash flow, does the lease contain any provisions which protect payments to RTD from the effects of inflation?
 My conclusion is "no," the cash flow participation of RTD is the only payment to RTD which will fluctuate depending on market conditions.
8. Is the developer required to pay a pro rata share of the taxes on the land? If not, will taxes on the land beneath the office building be paid by RTD or will such land be exempt from taxation?
 My conclusion is that while the developer may be required to pay the city a tax on the land under C.R.S. 1973, 39-3-112 (Supp. 1980), under the terms of the lease, the RTD has agreed to pay this cost.
9. Was RTD required to prepare systematic projections of the returns reasonably expected under the lease before entering into the lease option?
My conclusion is "no."
10. What actions would the RTD have to take in order to withdraw from the development agreement and lease option? What liability could the district realistically expect to incur as a result of such withdrawal?
 My conclusion is that there are several circumstances under which either party can terminate the development agreement. These are specified in the contract. If RTD were to breach the contract, it would run the risk of being liable to the developer for a money judgment which could include special damages, general damages including lost profits, costs, and attorneys fees.
ANALYSIS
Regarding question #1, section III D of the lease sets forth a formula for determining certain payments to be made by tenant to RTD over the term of the lease. Section III D (1)(iii) states, in brackets, "insert here the dollar figure representing one year's level debt service on the original long term mortgage financing for the superstructure less such portion of such dollar amount as represents mortgage interest deducted in arriving at net income before taxes." This amount is to be subtracted from "net income" (a term defined by reference to generally accepted accounting principles) in determining cash flow."
The term "debt service" is not defined in the lease. In rendering this opinion, I am assuming that it is used in its usual sense in real estate transactions and includes both principal and interest payments. See Sill Corp. v. United States,343 F.2d 411 (10th Cir.), cert. denied, 382 U.S. 840
(1965). This assumption is buttressed by the apparent indication in section III D (1)(iii) that the debt service costs on the original mortgage will not vary from year to year. Since, in an amortized loan, the amount of principal paid in each successive monthly payment increases slightly, debt service would vary if principal were not included in the term.
Under the terms of the lease RTD receives a portion of the "cash flow" from the leased premises. However, before "cash flow" is determined, "debt service" is subtracted from "net income." Therefore, I believe the cash flow formula clearly contemplates that RTD will not participate in revenue generated by the office building until after the annual debt service (both principal and interest) on the first long term loan for the project has been deducted from net income.
Regarding question #2, section III D (1) of the lease defines "proceeds from capital transactions" to include proceeds from the sale of "any property" and "proceeds from mortgage or other loans." Proceeds from capital transactions are excluded from "net income" for purposes of computing cash flow. Thus, amounts which are loaned to the developer (whether derived from original loans or refinancings) are not counted as income in determining "net income." You have also inquired whether profits realized by the tenant through sale of the leasehold are excluded from net income. The answer to this question is somewhat unclear, but it appears that the term "any property" could be construed broadly enough to encompass sale of the leasehold. If so construed, proceeds from such a sale would be excluded from net income for purposes of determining cash flow.
Regarding question #3, section XIX of the lease permits transfer of the leasehold interest by tenant at any time after the date of substantial completion of the office building and specifically provides that upon such assignment, "tenant shall be released from any and all obligations accruing after the effective date of said transfer." The language of the lease does not require tenant to obtain RTD's approval of such an assignment or of the assignee, and therefore, in my opinion, RTD has no right to disapprove an assignee selected by tenant. This conclusion is supported by two provisions of the development agreement, which was apparently negotiated simultaneously with the lease. Paragraph 18 on pages 25-27 of the lease specifies certain conditions under which developer may assign the development agreement prior to execution of the lease. One of those conditions is approval of RTD, with the limitation that such approval cannot be unreasonably withheld. Paragraph 18 indicates that if RTD's approval of an assignee of the lease were required, specific language would have been included to that effect. Paragraph 20 of the agreement discusses certain modifications to the lease which may be required by mortgage lenders. Subsection (h) of that paragraph states that such modifications need not be agreed to by RTD if they "change the limitation on assignment of lease prior to completion of superstructure except for the exercise of foreclosure and similar rights" (emphasis added). Paragraph 20(h) indicates that only assignments made prior to completion of the office building require RTD approval. Construing the development agreement and the lease together, it appears that where limitations on assignment were intended by the parties, those limitations were set forth specifically.
Regarding question #4, section XVII of the lease gives the tenant the right to mortgage its leasehold interest in the property. While section XVII does contain certain restrictions on this right to mortgage, nothing in the lease gives RTD the right to approve or limit the amount, timing, or terms of payment for any loan secured by such a leasehold mortgage.
Regarding question #5, as discussed above, it appears that RTD has no right to limit the amount, timing or repayment of mortgage financing for the project. Thus, if market conditions permit, tenant can finance the entire cost of the office building through debt financing. For purposes of determining cash flow, the debt service deduction from net income for the entire term of the lease is established by the first "long term" mortgage loan for which the office building serves as collateral. Section III D (1)(iii).
Depending on the principal amount of the initial mortgage loan, the interest rate and the period of amortization of the loan, the amount of the debt service deduction will vary. Thus, an initial capital structuring of the project which is based primarily on debt financing will result in a higher debt service deduction throughout the term of the lease than an initial capital structure made up of substantial contributions of equity.
Nothing in the lease precludes tenant's tenant from using his own capital to pay the original long-term loan prior to its maturity date. The question is whether such payment falls within the definition of tenant's cash equity as "monies actually invested . . . to develop the improvements." If the mortgage loan was used to "develop the improvements," I believe a substitution of equity for all or a portion of that loan could be construed to be an investment to develop the improvements. Thus, it appears that tenant could establish an initially "high" debt service deduction, and then later prepay that loan by investing his own money, thereby increasing tenant's cash equity under section III D (2), while maintaining a debt service deduction which does not reflect the later capital restructuring.
Whether the infusion of equity capital by some party other than tenant (such as a joint venturer who agrees to provide equity in return for a share of profits) will be counted toward tenant's cash equity is a question which depends both on the specific arrangements between developer and the third party and on the proper construction of the words "parties claiming through or under tenant," contained in the definition of tenant's cash equity. Your question asks whether a "refinancing based on a lender equity participation" would increase tenant's cash equity. If the arrangement is one in which the lender gives a below-market interest rate on money borrowed by the developer in exchange for a share of the profits, there would appear to be no actual investment of monies by the lender in the project, and therefore no increase in tenant's cash equity. If, however, the investor provides capital which is not in the form of a loan, tenant's cash equity will increase provided that the arrangement is construed to create a claim of such investor "through or under tenant."
I note that the phrase "actually invested by tenant, and parties claiming through and under tenant" in the definition of tenant's cash equity is somewhat ambiguous. It is not clear whether it is intended to cover only persons or entities who have a legal interest in the leasehold or also those which have a right to financial participation in the project through arrangements with the developer.
In responding to your question, an additional provision of the lease must be considered. Section XVI (2) of the lease requires tenant to "operate the Superstructure in a prudent and business-like manner with the purpose of maximizing cash flow while maintaining and operating the Superstructure in a first class manner." It could be argued that this covenant prohibits "manipulation" of the capital structure of the project by substituting equity for debt after the initial debt service deduction is established.
However, the definition of "cash flow" does not include the portion of the lease which defines tenant's cash equity. In other words, a requirement to maximize cash flow does not imply a requirement to minimize tenant's cash equity. (If the language of the covenant read "maximize RTD's participation in cash flow," tenant's cash equity would become a factor in determining compliance with the covenant.) In addition, the covenant requires tenant to "operate the substructure" in a manner which optimizes cash flow. These words imply that the covenant extends to operation of the building (rent and expenses), not to capital structuring. Because the debt service deduction is established by the first actual long-term loan, it can be argued that any subsequent capital restructuring which substitutes equity for debt does not affect cash flow in any manner, and therefore is not prohibited by the covenant contained in section XVI (2).
Regarding question #6, the covenants of tenant contained in section XVI obligate tenant to "operate the Superstructure in a prudent and business-like manner, with the purpose of maximizing Cash Flow," and require that the level of expenses incurred in operating the building be "reasonable when compared to that experienced by comparable building operations in the central business district of Denver, Colorado." If tenant were to incur unreasonably high expenses or if the operation of the building was not "prudent and business-like with the purpose of maximizing case flow," tenant will have breached covenants of the lease.
Regarding question #7, the lease provides two types of payments to RTD: minimum rent and participation in cash flow. Minimum rent is a fixed number in any given year of the lease, and does not increase or decrease depending on economic conditions. Therefore, cash flow payments are the only provision which may protect RTD from inflation.
Regarding question #8, real property owned by the state and its political subdivisions is generally exempt from property taxation. C.R.S. 1973, 39-3-101(1)(d). Since RTD is a political subdivision of the state, C.R.S. 1973, 32-9-119(1)(a), RTD land is generally exempt from taxation. C.R.S. 1973, 39-3-112 (Supp. 1980) (possessory interest tax) sets forth certain circumstances in which exempt property leased to and used by private persons is subject to taxation. The possessory interest tax law, however, has numerous exceptions. The initial decision as to the applicability of the possessory interest tax law to the land in question lies with the assessor for the county. C.R.S. 1973,39-5-101. If one of these exceptions is found to apply, then neither the developer nor RTD will incur any property tax liability on the land.
If none of the exceptions to C.R.S. 1973, 39-3-112 (Supp. 1980) is found to apply, then the developer will be "subject to taxation in the same amount and to the same extent as though the lessee or user were the owner of such property. . . ." Therefore, if the city of Denver finds that the developer is required to pay taxes under the possessory interest statute, it will assess the tax against the developer. However, under the terms of section VII of the lease the RTD has agreed to "pay all real property taxes / on / the land." If the possessory interest tax is construed to be a tax on the land, RTD has agreed to pay these taxes under the terms of the lease, and its tax exempt status will not insulate it from this liability.
Regarding question #9, our research has revealed no statute which requires a political subdivision of the state to determine projected revenues from a leasing arrangement. Subdivisions of the state (with certain exceptions which are not applicable to RTD) are required to prepare annual budgets setting forth proposed expenditures and anticipated revenues for each fiscal year. C.R.S. 1973, 29-1-104. However, this statute does not require a projection of income for future fiscal years.
Regarding question #10, in answering this question, a distinction needs to be made between terminating the contract and breaching it. Termination refers to a party's right to declare a contract at an end. Thus, a party may terminate a contract, if thecontract so provides, without incurring any liability other than that stated in the contract. Breach of contract is a different concept. This refers to a party's failure to perform duties which it contractually has accepted. Normally, a party which breaches a contract may be sued for damages. Because the concepts of termination and breach are distinct, I will treat them separately in this opinion.
A contract can always be terminated by consent of the parties. Thus, if the RTD withdraws from the development and lease option agreement with the developer's consent, it can do so without incurring any liability. In such case, the developer would probably require a payment from RTD in at least the sum of $100,000 (the good faith deposit).
Assuming that the developer refuses to terminate the contract by agreement, RTD can still terminate the agreement if (1) there is a breach by the developer or (2) RTD decides not to build the substructure. Section 26 H of the development agreement permits either party to terminate the agreement if the other party defaults or breaches any provision, except a failure to pay money, and such breach is not cured within 15 days. Section 26 H does not state whether the nondefaulting party would be entitled to sue for damages as well. In the absence of detailed information, we cannot determine whether either party presently has grounds to terminate the contract under this provision.
Section 24 of the development agreement lists the circumstances under which the parties may terminate the contract for reasons other than a breach by the other party. Under this section, RTD can terminate the contract at any time prior to the date of the closing of the lease option "in the event it determines not to construct the Substructure." "Substructure" is defined in section 1 of the agreement as "a multilevel public transportation facility." Presumably, the law would require a good faith determination not to build the substructure — RTD might well be subject to liability if it notified the developer that it had determined not to build the substructure and a short time later changed its mind and proceeded to build a facility similar to the one currently planned. The breadth of the term "substructure" is significant in this respect. If RTD terminates the agreement because it decides not to build the substructure, all payments made by the developer to RTD must be returned to the developer.
Section 26 also states that RTD may terminate the agreement and keep all payments made by the developer if: (1) the developer fails to approve working drawings within the time period specified in the agreement; or (2) "The lease is not executed and delivered by Developer as contemplated in section 16, although none of the occurrences described in Subsection A-E above have occurred." (This is apparently a typographical error since the subsections above are labeled A-F.)
The developer may terminate the contract far more easily than RTD. Since the agreement is an option contract, the developer can avoid any long-term obligations by simply choosing not to exercise its option. In addition, section 24 permits developer to terminate the development agreement at any time prior to the execution and delivery of the lease. That section specifies certain circumstances in which RTD is required to return to developer amounts previously paid to RTD.
If RTD breaches the agreement (as distinguished from terminating it), it risks being liable to the developer for damages. As noted above, it is not clear under section 26 H whether a nondefaulting party is entitled to sue for damages. If a court construed the agreement to permit a damage action, the developer could recover any special damages it has incurred (i.e. actual costs in developing the project). Moreover, RTD might also be liable to developer for lost profits. See, S. Jon Kreedman Co. v. Meyers Bros. Parking Western Corp., 58 Cal.App.3d 173,130 Cal.Rptr. 41 (1976); 5 Corbin on Contracts, secs. 1022, 1024 (1964). Whether lost profits will be awarded to a plaintiff in a breach of contract action is a question of proof. Courts will not award damages which are speculative, conjectural, or uncertain. Id;, Nevin v. Bates, 141 Colo. 255,347 P.2d 776 (1960). Lost profits are frequently found to be speculative where the business seeking to prove losses is a new one and cannot introduce evidence of past profits. Nevin v.Bates, supra; Mustard's Last Stand, Inc. v.Lorenzen, 39 Colo. App. 225, 566 P.2d 1082 (Colo.App. 1977), reversed on other grounds, 196 Colo. 265,586 P.2d 12 (1978). See also Milheim v. Baxter,46 Colo. 155, 103 P. 376 (1909). See generally Annot. 88 A.L.R.2d 1024 (1963). However, it has also been held that lost profits may be awarded even though they cannot be computed with precision. See, S. John Kreedman Co. v.Meyers Bros. Parking Western Corp, supra;Uinta Oil Refining Co. v. Ledford, 125 Colo. 429,244 P.2d 881 (1952); Boyle v. Bay, 81 Colo. 125, 254 P. 156
(1927). See generally Annot. 92 A.L.R. 3d 1286 § 3 (1979). Therefore, if the developer were able to prove his lost profits with some measure of certainty, the courts would probably award damages for lost profits in addition to special damages.
Additionally, I should point out that according to section 26 E of the development agreement, if a lawsuit is instituted, the prevailing party is entitled to recover its full costs and reasonable attorneys fees from the other party.
SUMMARY
This opinion is an interpretation of various provisions of the lease and development agreement between RTD and the developer.
Very truly yours,
 J.D. MacFARLANE Attorney General
CONTRACTS TRANSPORTATION, PUBLIC TAXATION AND REVENUE
C.R.S. 1973, 39-3-112
LEGISLATIVE BRANCH General Assembly
Interpretation of various provisions of the lease and development agreement between RTD and the developer.