459 F.2d 185
 UNITED STATES of America, Appellee,
v.
79.95 ACRES OF LAND, MORE OR LESS, Situate IN ROGERS COUNTY,
STATE OF OKLAHOMA, and June Collins, et al., and
Unknown Owners and International
Equipment Leasing Corp., Appellant.
 Nos. 71-1484 to 71-1491, 71-1773, 71-1776.
 United States Court of Appeals,
Tenth Circuit.
 April 24, 1972.
Rehearing Denied June 1, 1972.
 
 Dirk D. Snel, Atty., Dept. of Justice, Washington, D. C. (Nathan G. Graham, U. S. Atty., Tulsa, Okl., Shiro Kashiwa, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., George R. Hyde, Atty., Dept. of Justice, Washington, D. C., Hubert A. Marlow, Tulsa, Okl., on the brief), for appellee.
 Thomas A. Landrith, Jr., Tulsa, Okl., for appellant.
 Loy R. Davis, Nowata, Okl., for Moore and Cummins, appellees.
 Dale Warner, Tulsa, Okl. (Rucker, Tabor, McBride & Hopkins, Tulsa, Okl., on the brief), for Ben Bly d/b/a Angle Oil Co., appellee.
 Before LEWIS, Chief Judge, HOLLOWAY and BARRETT, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 This is a consolidated action arising out of condemnation proceedings brought by the United States relating to several tracts of land in Rogers and Nowata counties, Oklahoma. On July 23, 1969, the United States filed several declarations of taking and complaints in connection with the Oologah Lake Project on the Verdigris River. The interests taken include the working and royalty interests in oil and gas leases which existed on the lands in issue here. The Plaintiff waived jury trial. A panel of three commissioners was then appointed under Rule 71A(h), Fed.R.Civ.P. to hear evidence and to determine the just compensation to be paid for each interest taken, and to report to the Court as provided by Rule 53(e) (2), Fed.R.Civ.P.[1] International Equipment Leasing Corporation, a working interest owner, appeals from the lower court judgment which adopted the Commission's determination on just compensation. The United States cross-appeals from the lower court's instruction to the Commission that it was not to consider the cost of plugging the existing unplugged oil, gas or water injection wells on the leases in considering just compensation. The effect was to cast the burden of any plugging costs on the United States.
 
 
 2
 International Equipment Leasing Corp., (International), became the reluctant operating owner of several tracts of land which included the Wilburn Water Flood project, a part of the Talala Project in Rogers County. The properties were acquired from Midland Oil and Gas Company as a result of foreclosure proceedings. International took operating possession of the properties on June 3, 1966. International first learned of the proposed taking in October of 1967 when government surveyors commenced work on the properties.
 
 
 3
 The Wilburn Water Flood project consists of seven leases which total about 350 acres. The unit is in secondary recovery under a water flood program initiated in 1953. There are 100 producing oil wells and 97 water injection wells on the properties. The Government condemned 179.60 acres of International's interest in the unit which included 61 producing oil wells and 44 injection wells.
 
 Fair Market Value
 
 4
 The Commission found that the fair market value of the International oil reserves taken was $464.00 and that the lease equipment was of the fair market value of $13,875.00. International was awarded $14,339.00 for its combined interest. The court below entered judgment for International in accordance with the Commission's award.
 
 
 5
 International alleges error in exclusion of the testimony of H. B. Gutelius, Jr., President of International, relating to acquisition costs of the properties. The general rule is that evidence of the purchase price may be admitted in a condemnation suit if the sale is not too remote. 29A C.J.S. Eminent Domain Sec. 273(5). However, a foreclosure sale is not an arms length transaction involving a willing buyer and a willing seller. The amount of money one has "invested", i. e., paid, in the acquisition of property by foreclosure is not relevant in a condemnation suit. It is not evidence of fair market value. United States v. 5,139.5 Acres of Land, In Aiken and Barnwell Counties, S. C., 200 F. 2d 659 (4th Cir. 1952).
 
 
 6
 International complains that the testimony of its expert, G. L. Howse, was ignored in favor of the testimony of the Government's expert witnesses. Howse is a petroleum engineer. His estimate of the recoverable oil reserves in the Wilburn Water Flood project and the undeveloped acreage was much greater than the estimates of the Government's expert witnesses. Upon review we do not retry the facts, and a finding based on sharply conflicting evidence is binding here. Buena Vista Homes, Inc. v. United States, 281 F.2d 476 (10th Cir. 1960). The test of whether the trial court has committed reversible error in adopting the award of a Commission is whether the award is clearly erroneous, based upon misapplication of law, unsupported by the evidence or contrary to the clear weight of the evidence. Thetford v. United States, 404 F.2d 301 (10th Cir. 1968); Wilson v. United States, 350 F.2d 901 (10th Cir. 1965); United States v. Waymire, 202 F.2d 550 (10th Cir. 1953).
 
 
 7
 International strenuously argues that the judgment is predicated upon inaccurate testimony given by the Government's experts in the field of petroleum engineering relating to the value of oil reserves. Their opinions were based upon the declining curve of production. They assumed normal operating procedures. International argues that this data was faulty in light of the fact that the properties were allowed to deteriorate after International learned of the taking in October of 1967. There was substantial evidence that before International had notice of the taking that the production curve was on a sharp decline. Whether one uses 500 barrels or 1,200 barrels annual production as the "break even" point, the producing leases were at or near their economic limits. International contends that the undeveloped acreage had a certain value for oil reserves and that it is common in the industry to hold undeveloped acreage for future development. While this is true, the record reflects that four other operators preceded International over a span of years and that none had undertaken any exploration or development operations on the subject properties. This is indicative that the properties were not worth developing. A Government expert who examined cores taken from three wells drilled on the undeveloped properties testified that there was no oil underlying these lands. We appreciate the fact that there can be no absolutes in the speculative area of oil reserves. Reliance must necessarily be placed on expert testimony. There is substantial evidence supporting the awards relating to the fair market value of the oil reserves.
 
 Plugging Costs
 
 8
 The trial court instructed the Commission to disregard plugging costs in fixing just compensation. The Government claims that in determining fair market value plugging costs must be considered. International is joined by several other lease operators whose interests were taken under the same condemnation project in challenging the Government's contention.
 
 
 9
 The laws of the State of Oklahoma in force at the date of taking provided that the owner or operator of an oil well is responsible for plugging in accordance with the rules of the Corporation Commission. 17 Okla.Stat.Ann. Sec. 53 (1951). Corporation Commission Regulation No. 609 was promulgated thereunder. 52 Okla.Stat.Ann. Secs. 309 and 310 declare that it is in the public interest that all wells must be plugged which have been abandoned. Here the oil wells were producing when condemned. Nothing in this record indicates that the wells were leaking salt water, oil, gas or other deleterious substances.
 
 
 10
 In Bryan v. State ex rel. Shefts Supply Co., 133 Okl. 213, 271 P. 1020 (1928), the order of the Oklahoma Corporation Commission requiring plugging of an "abandoned" oil well was affirmed. There the owner had terminated drilling operations on the well. He testified before the Commission that he intended to resume operations after using his drilling tools upon another lease. The Commission granted the owner a specific time within which to commence the drilling operation or plug the well. When he failed to resume the drilling operation, the Commission ordered that the well be plugged. On appeal, the owner contended that he intended to continue operations on the well. Every witness testified that the well was in such condition that drilling might be continued. The Court applied the maxim that "actions speak louder than words" in holding that the owner had abandoned the well, noting that intention to abandon may be established by acts rather than from possibilities of future use.
 
 
 11
 Applying those tests here we note that the acts of International were affirmative at the time of the taking, regardless of the nebulous life of production or the economics of continuing operations. In regard to International's "intention", we see real merit in its contention that it was justified in its determination not to expend further funds on the waterflood project in respect to upkeep or replacement of equipment after notice of the Government's intention to take the properties in October, 1967. The properties were in fact operated by International at the date of taking. The wells had not been abandoned. Accordingly the statutory obligation to plug the wells had not come about at the date of taking. Any willing purchaser of these interests would have been required to relieve the seller of the obligation to plug. The Government thus "purchased" the leases in question by its taking. It succeeded to the interest of the owner. Richland Irrigation District v. United States, 222 F.2d 112 (9th Cir. 1955), cert. denied 350 U.S. 967, 76 S.Ct. 437, 100 L.Ed. 840 (1956). While the Government's experts' testimony that producing reserves of most of the leases were minimal was adopted in determining just compensation for oil reserves, that does not alter the fact that the wells were not abandoned; they were still producing. Wood v. Arkansas Fuel Oil Co., 40 F.Supp. 42 (W.D.Ark.1941); Magnolia Petroleum Co. v. St. Louis-San Francisco Ry. Co., 194 Okl. 435, 152 P. 2d 367 (1944). We concur with the trial court in holding that the Government is liable for any plugging costs.
 
 
 12
 The condemnees were compensated for the loss of recoverable reserves and salvageable equipment. This is what they lost. Any inherent future liabilities running with the land became the obligation of the Government. The fact that the United States may determine that it is necessary to plug the wells immediately in order to adapt the properties to their intended use is of no consequence.
 
 
 13
 Affirmed.
 
 
 14
 HOLLOWAY, Circuit Judge (concurring and dissenting):
 
 
 15
 I agree with the Court's opinion in all respects except as to the well plugging issue, on which I respectfully dissent.
 
 
 16
 I agree that the Government is liable for any plugging costs. The fact that the interests were taken did not precipitate the plugging responsibility so as to impose that burden on the leasehold owners. However, I believe that this does not decide the issue on the well plugging matter before us. The issue is, I feel, whether this well plugging burden and its weight, if any, influencing market value at the time of the taking may be considered.
 
 
 17
 On our record I believe that there was substantial proof that production on the properties was approaching the end of its commercially feasible operation. It is, of course, undisputed that upon abandonment the then owner would be required to plug the wells under the Commission's supervision. Moreover, there was proof that the burden of plugging expense is taken into account between willing buyers and sellers. Further, under the engineering appraisal method of valuation, there was testimony that the plugging costs were properly chargeable as an expense to arrive at the appraised fair market value.
 
 
 18
 The District Court's instructions to the Commission permitted taking proof on the well plugging matter but directed that market value should be determined without considering this element. While it might be determined from the proof at trial that abandonment and the plugging burden were too remote to consider, I think the Commissioners should not have been instructed as a matter of law before trial to disregard the well plugging factor entirely. Instead, I feel they should have been instructed that if they found that abandonment and the plugging expense were not remote or speculative, and that they would have been considered by a willing purchaser, then they should take into account the influence on fair market value, if any, that the future plugging obligation was exerting at the time of taking. Such consideration of the proof was called for, I feel, by the rule broadly favoring admissibility of relevant evidence showing what the market value was as between a willing buyer and seller. See United States v. Sowards, 370 F.2d 87, 90 (10th Cir.).
 
 
 19
 Such influences of administrative regulations on market values have been considered in condemnation proceedings, taking into account likely future events or modifications of regulations. See, e. g., Rapid Transit Co. v. United States, 295 F.2d 465, 466 (10th Cir.), cert. denied, 369 U.S. 819, 82 S.Ct. 831, 7 L.Ed. 2d 785; H & R Corporation v. District of Columbia, 122 U.S.App.D.C. 43, 351 F.2d 740, 742-743; and Fairfield Gardens, Inc. v. United States, 306 F.2d 167, 170 (9th Cir.). Likewise I feel proof on the well plugging matter was a proper factor for the Commission to weigh.
 
 
 
 [1]
 In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous . . . The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions