UNITED STATES of America,
Plaintiff-Appellant,

v.

179.26 ACRES OF LAND IN DOUGLAS
COUNTY, KANSAS; Charles A. Walter
et al., Defendants-Appellees.

No. 79–1576.

United States Court of Appeals,
Tenth Circuit.

Argued Jan. 20, 1981.

Decided March 26, 1981.

Edward J. Shawaker, Atty., Dept. of Justice, Washington, D. C. (James W. Moorman, Asst. Atty. Gen., Washington, D. C., James P. Buchele, U. S. Atty., and Roger M. Theis, Asst. U. S. Atty., Topeka, Kan., and Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., with him on the brief), for plaintiff-appellant.

John R. Hamilton of Crane, Martin, Claussen, Hamilton & Barry, Topeka, Kan. (Byron E. Springer of Barber, Emerson, Six, Springer & Zinn, Lawrence, Kan., with him on the brief), for defendants-appellees.

Before HOLLOWAY, BARRETT and DOYLE, Circuit Judges.

BARRETT, Circuit Judge.

The United States of America (Government) appeals an award of damages entered for land condemned pursuant to Fed.Rules Civ.Proc. rule 71A(h), 28 U.S.C.A. The Government challenges the District Court's judgment approving and confirming the Commission's report determining the land's fair market value. The appellees, Charles A. Walter and Ella M. Walter, his wife, were the owners of the land. They will be hereafter referred to as landowner or Walter.

Succinctly, on appeal the Government challenges the Commission's determination-finding that limestone underlying a portion of the land had a determinable value of $243,930.00. The Government contends

that no consideration should have been accorded the presence of limestone in the property to be taken. Alternatively, the Government argues that the Commission's method of valuation attributed to the limestone in the land was erroneous as a matter of law.

The condemnation action was brought to acquire 179.26 acres of land in fee out of a total tract of 282.39 acres owned by landowners. The lands condemned are to be used in conjunction with the construction and operation of Clinton Lake, Kansas, as part of a comprehensive plan for flood control and other purposes in the Missouri River Basin. The parties entered into a pretrial stipulation that the entire award was to be rendered to Walter and that no separate allocation of any award need be made between Walter, as lessor, and Martin Marietta Corporation, as lessee of the tract. The lessee disclaimed any interest in the land for purposes of the proceeding. The trial proceeding before the Commission involved six days, and the report consists of some 40 pages.

There is agreement between the parties that at the date of the taking there were no sales of comparable quarry land. Thus, if the limestone was to be considered in arriving at the total valuation (which the Government insists was erroneous) the *method* of valuation employed by the Commission becomes the sole battleground on appeal. Some background discussion may serve to focus on the issues.

The Commission found that at the date of the taking on January 4, 1979, the land was being used for livestock and grain production and a rock quarry and that it contained some 2,400,000 tons of Plattsmouth limestone reserves within a 44.6 acre area and the quarry site. The Commission found that the highest and best use of the land at the date of the taking was that of commercial quarry and livestock and grain production; the fair market value of the land immediately before the taking was $315,-930.00; and the fair market value of the

remainder immediately after the taking was $72,000.00, resulting in a valuation reduction by virtue of the taking of $243,-930.00. The Commission thus found, and the District Court concurred, that the landowners are entitled to just compensation at the date of taking in amount of $243,930.00. Judgment was awarded in that sum.

In arriving at the compensation award, the Commission found that: the limestone reserves underlying the 44.6 acres would have produced and sold 100,000 tons per annum for the life of the quarry, found to be twenty years following the taking; the limestone would produce a net annual return of 26 cents per ton or $26,000.00 per year for a 20-year period; a proper capitalization rate was 18 percent per annum; the income and capitalization computation basis was the proper method to employ in light of the absence of comparable sales for the limestone reserves; applying the Inwood Table, the proper factor to be used to determine the percent value of $1.00 to be paid for each year for 20 years with a capitalization rate of 18 percent is 5.352747; and, accordingly, the present contributory value of the limestone reserves in place was $26,-000.00 multiplied by 5.352747 or $139,170.00.

### Issues on Appeal

 The Government's first contention on appeal is that the presence of limestone in the lands should not have been considered or given any consideration on the value of the land. We hold that this contention is without merit. The record is replete with substantial evidence which, if credited by the fact finders (Commission), does not permit acceptance of the Government's contention. The evidence is such that, on appeal, it cannot be rejected as clearly erroneous. The appellate court reviews the determination of a district court in condemnation proceedings only to determine "... whether proper legal standards were applied in resolving the issue of just compensation and whether any supplemental findings of the district court were clearly erroneous. A commission's findings are

considered only to see whether the district court properly accepted and approved them as not being clearly erroneous. *United States v. Brinker*, 433 F.2d 773 (10th Cir. 1969)." *United States v. Corbin*, 423 F.2d 821, 824 (10th Cir. 1970). Applying this standard, we hold that the evidence supports our conclusion that it was not clearly erroneous to consider the presence of the limestone underlying the land as affecting the value of the land.

The Government's second contention—and that which we now address—is that the Commission's method of valuation of the limestone, *i. e.*, capitalizing the income to be expected from the limestone over a period of 20 years and deriving the rate of income for that capitalization from the current selling price of limestone, minus the costs of production, was so speculative and unreliable that it should not have been admitted as evidence or adopted by the Commission and the District Court.

### Arguments of the Parties

The thrust of the Government's evidence in support of its theory of the case relative to the value of the limestone is that: both the Government's witnesses and the landowners' witnesses established that the Walter land had been previously leased for limestone since the year 1948 with royalty payments varying from 3 cents per ton to 8 cents per ton; the current royalty for leasing limestone in the area amounted to from 8 to 10 cents per ton; the actual mining history relative to the tract disclosed that sales of limestone from the Walter quarry were substantially less than the 100,000 tons per year estimated by Walters' valuation witnesses, *i. e.*, an average of 6,446 tons per year from 1963 to 1973 and 60,000 tons from 1974 to 1975, all of which was crushed in 1974; its expert witness, Robert McElvaine, testified that only 19,000 tons per year had been quarried from the tract from 1948 to 1963; Charles Nichols, a geologist for Martin Marietta Company, lessee of the quarry, testified that the quarry could not sell 100,000 tons per year; and, Herman Oakes, an appraiser, testified on rebuttal

that in his opinion a proper capitalization rate for return to land in a mining operation was 25 percent. The Government urges, based on its evidence, that the prevailing royalties in the area, *i. e.*, 8 to 10 cents per ton, are directly related to the market value of the limestone, and use thereof by the Commission would have eliminated the highly speculative method of valuation employed.

The landowners' expert witness on the limestone reserves in the quarry and the market therefor was Verne E. Dow, a consulting geologist. He testified that: he had been intimately familiar with the quarry and all prospecting and mapping at this location for Martin Marietta Corporation from 1963 to 1974; the geologic structure indicated that the quarry contained 2,410,000 tons of Plattsmouth limestone reserves at the date of the taking; there are some thirteen criteria essential to render a quarry commercially viable and the Walter quarry met each; a market would exist for the limestone from the Walter quarry, based on the history of the quarry and knowledge of the area, for a 20-year period from the date of the taking at the rate of at least 96,000 tons per year and it could average as much as 200,000 tons per year, based on population growth (the subject quarry is located about 7 miles west of Lawrence and 12 miles east of Topeka, within the growth area of both cities); as to the production history from the quarry from 1963 to the date of taking, production was adversely affected by the announcement of the construction of the Clinton Reservoir because farmers were reluctant to put lime on their fields and use of crushed limestone for township and county roads in the area was likewise curtailed; if the Clinton Reservoir had not been announced, limestone from the Walter quarry and other quarries in the vicinity would serve an 80-square mile market with an increased market in crusher run products, agricultural lime, lateral rock, cover material, riprap, concrete stone and asphalt stone, with projected annual use from 1977 to 1997 of 14,000 tons of limestone for FAS roads, 25,000 tons for county

and township rock, 28,000 tons for agricultural use and 29,000 tons for commercial sales, predicated on statistics for per capita use based on projected population growth in the area; that the limestone underlying the condemned tract could not be economically quarried under known methods and marketing conditions, after the taking.

Walters' witnesses Haley and Brink testified as experts in the area of valuation. Eugene Haley testified that: he consulted with Mr. Dow, investigated the history of the quarry, interviewed other quarry owners and operators in the area and relied on his own knowledge and experience in appraising lands with limestone reserves, some of which he had personally owned. Mr. Brink testified that: he had previous experience in appraising real estate with mineral deposits and had testified before federal commissions with respect to contributory values of mineral deposits; he had prepared himself for the appraisal of the Walter quarry limestone reserves by consulting with other quarry owners and operators in the area and with Mr. Dow; he also relied upon his own experience and knowledge of the subject property, with which he had been familiar for some 30 years, and like knowledge of the surrounding area.

The testimony of Mr. Haley and Mr. Brink was substantively identical on valuation, as follows: the average market price for rock similar to that underlying the Walter quarry at the time of the taking was $2.00 per ton; predicated on the $2.00 per ton market price, the net economic return to the land for the limestone reserves was 26 cents per ton after deducting per ton costs of 20 cents for removing overburden, $1.10 for production, equipment and selling, 15 cents for administration and overhead, totaling $1.45 per ton; leaving 55 cents per ton net return, of which the quarry operator is entitled to a 20% return of the entire production cost of $1.45, or 29 cents per ton, and 26 cents net return to the land. These costs and production calculations were arrived at following conferences with those engaged in the industry and from prior knowledge. Both Mr. Haley and Mr. Brink

testified that there was a market for the limestone of 100,000 tons per year. However, Mr. Haley estimated the reserve life span at 20 years, while Mr. Brink estimated it at 24 years. Both witnesses determined that the 15 percent capitalization rate was proper to convert future periodic payments to present value of the limestone reserves through use of that known as the Inwood Table; thus, these experts testified as follows relative to the contributory value:

*Mr. Haley:*

| | |
|---|---|
| Return each year upon rate of 100,000 tons: | $26,000.00 |
| 15% Capitalization factor for payment of $26,000 per year for 20 years: | 6.259331 |
| Present value of return of $26,000.00 per year for 20 years: | 162,743.00 |
| Present value per acre of 44.6 acres of limestone reserves (162,743.00 divided by 44.6): | $ 3,648.95 |

*Mr. Brink:*

| | |
|---|---|
| Return each year upon sale of 100,000 tons: | $26,000.00 |
| 15% Capitalization factor for payment of $26,000.00 per year for 24 years: | 6.434 |
| Present value per acre of 44.6 acres of limestone reserves (167,284 divided by 44.6): | $ 3,751.00 |

*The Commission's Report-Findings Approved By the District Court*

The Commission's report, with attached exhibits, consists of 46 pages in this record. [R., Vol. I, pp. 101–147]. It thoroughly reviewed the testimony of each witness, including comparable sales (none of which related to rock quarry property) submitted by the parties. The Commission found that the highest and best use of the Walters tract as of the date of taking "... was commercial quarry and livestock and grain production" and that "... these uses were compatible." [R. Vol. I, p. 137].

Further, lacking evidence of comparable rock quarry sales, the Commission found that the Walters tract, because of its close location between the growth areas of the cities of Lawrence and Topeka, was the source of a market for an aggregate from the subject quarry of 100,000 tons per year over a life of 20 years and that there remained on the tract at the date of taking

2,400,000 tons of Plattsmouth limestone. [R., Vol. I, p. 137]. Applying the income and capitalization approach to determine fair market value as urged by the Walters' experts, Haley and Brink, and relying upon the technical testimony of geologist Dow [R., Vol. I, p. 139], the Commission found that "... the fair market value of the subject tract at the date of taking, January 4, 1977, was $315,930.00 and that the improvements thereon contributed $30,000.00 to the value thereof; that the mineral reserves contributed $139,170.00 to the value of the same, and that the fair market value of the remainder immediately after the taking was $72,000.00 leaving a reduction of value as a result of the taking of $243,-930.00." [R., Vol. I, p. 139].

The Government's objections to the Commission's report before the District Court were basically anchored to the proposition that because the Commission substantially adopted the landowners' evidence which the Government contends was "largely speculative and conjectural in nature and ... legally insufficient to sustain their burden of proof," [R., Vol. I, p. 162], and did not articulate the path of reasoning underlying its valuation conclusions required under *United States v. Merz*, 376 U.S. 192, 84 S.Ct. 639, 11 L.Ed.2d 629 (1964) and *United States v. 20.53 Acres of Land*, 478 F.2d 484 (10th Cir. 1973), the report should be rejected. The Government argues that if the prevailing royalty rates in the area, *i. e.*, 8 to 10 cents per ton, had been used in lieu of the highly speculative 26 cents per ton, the resulting capitalized value of the limestone (at 18 percent) would have been $42,821.97 or $53,527.47, much less than the $139,-170.00 found by the Commission.

In its "Order Approving Report of Commission" the District Court rejected the above contentions advanced by the Government, finding that the Commission did comply with the specificity requirements of *Merz* and that the report discloses details showing clearly how the Commission arrived at its conclusions. Further, the Court found that the values found and determined "... were well within the range of the evidence and it cannot be said that they were clearly erroneous." [R., Vol. I, p. 175]. The Court gave due consideration to the element of credibility determination reserved to the fact finders (the Commission), and while recognizing that the quality of the proof was such that the Commission was faced with the necessity of conjecture, the contention that the award was based on pure speculation was rejected. The Court upheld the Commission's finding that: the highest and best use of the property was a commercial rock quarry and improved livestock and grain farm based upon the opinion of the Walters' experts that the condemned limestone had value as quarrying property with substantial quantities of recoverable rock of marketable quality; there was a present market and future demand; and the method of determination of fair market value and the award proper are supported by the evidence and are not clearly erroneous. [R., Vol. I, pp. 177–181].

### Our Disposition

■ The best evidence of market value of real property in condemnation is, of course, found in sales of comparable land within a reasonable time before the taking. *United States v. 25.02 Acres of Land, Douglas County, Colo.*, 495 F.2d 1398 (10th Cir. 1974). No such evidence was available in the case at bar. In *United States v. 25.02 Acres, supra*, we said:

The major factors to be considered in determining the market value of real estate in condemnation proceedings are: (a) a view of the premises and their surroundings; (b) a description of the physical characteristics of the property and its situation in relation to points of importance in the neighborhood; (c) the price at which the land was bought, if sufficiently recent to throw light on present value; (d) the price at which similar neighboring land has sold at about the time of the taking; (e) the opinion of competent experts; (f) a consideration of

the uses for which it is available; (g) the cost of the improvements if they are such as to increase the value of the land; and (h) the net income from the land, if the property is devoted to one of the uses to which it could be most advantageously and profitably applied. 4 Nichols on Eminent Domain, § 12.31[2].
495 F.2d at p. 1400.

In *United States v. Sowards*, 370 F.2d 87 (10th Cir. 1966), this Court recognized that the amount of coal in place is important in arriving at an opinion relative to fair market value and that qualified and knowledgeable witnesses may give their opinion or estimates of the value of the property taken but that:

> ... to have probative value, that opinion or estimate must be founded upon substantial data, not mere conjecture, speculation or unwarranted assumption. It must have a rational foundation.
> 370 F.2d at p. 92.

*Sowards* did, however, recognize that when lacking evidence of comparable sales, other evidence in support of other methods of valuation may be sufficient for determination of value. In *United States v. Corbin*, 423 F.2d 821 (10th Cir. 1970), this Court specifically recognized that where no comparable sales were available, the capitalization of net income approach to determine fair market value of a fish farm was appropriate. *Sowards* and *Corbin* are consistent with *Sill Corporation v. United States*, 343 F.2d 411 (10th Cir. 1965), *cert. denied*, 382 U.S. 840, 86 S.Ct. 88, 15 L.Ed.2d 81 (1965), where we said:

> ... the law is not wedded to any particular formula or method for determining the fair market value as the measure of just compensation.... It may be based upon comparable sales, reproduction costs, capitalization of net income, or an interaction of these determinants.
> 343 F.2d at p. 416.

This Court recognized that there can be no absolutes in the speculative area of oil reserves in *United States v. 79.95 Acres of Land, Etc.*, 459 F.2d 185 (10th Cir. 1972) where we said:

> We appreciate the fact that there can be no absolutes in the speculative area of oil reserves. Reliance must necessarily be placed on expert testimony. There is substantial evidence supporting the awards relating to the fair market value of the oil reserves.
> 459 F.2d at p. 188.

Courts have historically recognized that even though there is necessarily some element of speculation and uncertainty in the expert testimony relative to "in place" mineral reserves, still it is the best testimony of value. *Montana Railway Company v. Warren*, 137 U.S. 348, 11 S.Ct. 96, 34 L.Ed. 681 (1890); *United States v. Shoshone Tribe of Indians*, 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213 (1938); *United States v. 91.90 Acres of Land, Etc.*, 586 F.2d 79 (8th Cir. 1978), *cert. denied*, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979); *United States v. 2,847.58 Acres*, 529 F.2d 682 (6th Cir. 1976); Anno., 156 A.L.R. 1417.

This Court has rejected the capitalization valuation method of tonnage multiplied by unit price. *United States v. Sowards, supra*. This approach, *i. e.*, the unit-times-price method of evaluation has been rejected by many courts. *United States v. 91.90 Acres of Land, Etc., supra, Mills v. United States*, 363 F.2d 78 (8th Cir. 1966), and cases cited therein. Thus, in *United States v. 91.90 Acres of Land, Etc., supra*, the Court said:

> In the case of land that is underlaid with marketable minerals, including plastic clay, the existence of those minerals is a factor of value to be considered in determining the market value of the property, but the landowner is not entitled to have the surface value of the land and the value of the underlying minerals aggregated to determine market value. The value of the mineral deposit is to be considered only to the extent to which it goes into and affects the over-all market

value of the property. And it is generally not permissible to determine the value of a mineral deposit by estimating the number of tons in place and then multiplying the tonnage by a unit price per ton.

586 F.2d at p. 87.

The Government indicates that the landowners in the case at bar relied on the simplistic "unit-times-price" method to assign value to the limestone reserves. Such, however, is not the case. Many other factors were developed in the evidence and used in the landowners' demonstration of the contributory value of the limestone in place. Furthermore, it is our view that the competency of landowners' witnesses Dow, Haley and Brink was established and proper foundations laid for their testimony. In *Sowards, supra*, the only evidence relative to the per ton valuation of the coal in place was that of the nonexpert landowner. The court held that the presumption of the owner's special knowledge had been negated by his own testimony; accordingly, his opinion was without probative value. In *United States v. 91.90 Acres of Land, Etc., supra*, the court held that the testimony of the landowner's two managerial personnel of estimates of tonnage of clay in the ground was not competent.

The courts have recognized that if the proof is not deficient, a present value for mineral interests taken in eminent domain proceedings may be determined by estimating the anticipated income that might be derived from the sale of the minerals over a period of time, and capitalizing that income in terms of its present worth. *United States v. Corbin, supra; United States v. Whitehurst*, 337 F.2d 765 (4th Cir. 1964); *United States v. 158.76 Acres of Land*, 298 F.2d 559 (2d Cir. 1962); *United States v. 1,629.6 Acres*, 360 F.Supp. 147 (D.Del.1973), *aff'd in part and rev'd in part on other grounds*, 503 F.2d 764 (3d Cir. 1974).

In *United States v. Silver Queen Mining Company*, 285 F.2d 506 (10th Cir. 1960), this Court acknowledged that any income approach on valuation of mineral in place necessarily involves prediction and conjecture:

Some speculation is inherent in the ascertainment of value of all resource property, be it mineral, oil, gas or otherwise, and if the quality of proof of value follows the custom of the industry, is the best available, and is sufficient to allow the jury or court to make an informed estimate as to the fact of value, such proof is sufficient to meet the burden. 285 F.2d at p. 510.

■ ˙ We are fully aware, as was the District Court, that this case presents difficult evaluation problems. We are convinced, from a complete review of the record, that the landowners' evidence was sufficient to allow the Commission to make an informed estimate as to the fact of value. The landowner met the burden of establishing by competent evidence the right to substantial compensation. 5 Nichols on Eminent Domain, § 18.5. In *United States v. Miller*, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943) the Supreme Court said:

Where, for any reason, property has no market, resort must be had to other data to ascertain its value; and, even in the ordinary case, assessment of market value involves the use of assumptions, which make it unlikely that the appraisal will reflect true value with nicety. It is usually said that market value is what a willing buyer would pay in cash to a willing seller. Where the property taken, and that in its vicinity, has not in fact been sold within recent times, or in significant amounts, the application of this concept involves, at best, a guess by informed persons.
317 U.S. at pp. 374–375, 63 S.Ct. at p. 280.

In *United States v. 494.10 Acres of Land in Cowley Cty.*, 592 F.2d 1130 (10th Cir. 1979), this Court said:
On this appeal we consider the findings of the trial court under Rule 52(a). *See*

374

*United States v. 79.95 Acres of Land, Etc., Rogers Co., Okl.,* 459 F.2d 185 (10th Cir.) and cases therein cited. The commission was properly instructed, it held evidentiary hearings, observed the demeanor of the witnesses, it viewed the property, filed a report which reviewed and evaluated the evidence, made a determination of credibility, and made awards within the scope of the evidence ... [citations omitted] ... As we have repeatedly said we will not reweigh the evidence, and will accept findings derived from conflicting evidence. *Wilson v. United States,* 350 F.2d 901 (10th Cir.). Obviously the findings must be supported by substantial evidence and the awards arrived at in accordance with the correct application of the law. *United States v. 46,672.96 Acres of Land, Etc.,* 521 F.2d 13 (10th Cir.).

592 F.2d at p. 1131.

In our view the valuation of the limestone reserves by the Commission, as approved by the District Court, finds support in the evidence. We thus hold that the findings and conclusions of the Commission and the District Court are not clearly erroneous.

WE AFFIRM.