836 F.2d 498
 UNITED STATES of America, Plaintiff-Appellant,
v.
2,560.00 ACRES OF LAND, MORE OR LESS, SITUATE IN WASHINGTON
COUNTY, STATE OF OKLAHOMA; Thomas Connelly Wallingford, et
al., and Unknown Owners; Earl G. Wallingford, III; George
Walter Wallingford; Claire L. Wallingford; Earl Laughlin,
Jr.; Clyde G. Layton; R.M. Layton; William Douglas
Layton; Layton Oil Company; 1,200.35 Acres of Land, More
or Less, Situate In Washington County, State of Oklahoma;
Clyde G. Layton, et al., and all Unknown Owners; Tog
George, Trustee for the benefit of Allied Bank of Texas;
Allied Bank, of Texas; 75.00 Acres of Land, More or Less,
Situate In Washington County, State of Oklahoma; Fitz-Lowe,
Inc., a Corporation, et al., and Unknown Owners; Tog
George, Trustee for the benefit of Allied Bank of Texas;
Allied Bank, of Texas, Defendants-Appellees.
 Nos. 85-2023 to 85-2025.
 United States Court of Appeals,
Tenth Circuit.
 Jan. 4, 1988.
 
 Laura E. Frossard, U.S. Dept. of Justice, Washington, D.C. (F. Henry Habicht II, Asst. Atty. Gen., Layn R. Phillips, U.S. Atty., and Nancy Nesbitt Blevins, Asst. U.S. Atty., Tulsa, Okl., Jacques B. Gelin and Maria A. Iizuka, Dept. of Justice, Washington, D.C., on briefs), for plaintiff-appellant.
 James E. Poe, Covington & Poe, and John S. Athens, Conner & Winters (Bill M. Shaw, Chapel, Wilkinson, Riggs & Abney, and J. David Jorgenson, with them on briefs), Tulsa, Okl., for defendants-appellees.
 Before MOORE and BARRETT, Circuit Judges, and ANDERSON, District Judge.*
 JOHN P. MOORE, Circuit Judge.
 
 
 1
 This is an appeal by the government from a district court's order affirming a commission's award of nearly five million dollars for the subordination of certain mineral rights in Washington County, Oklahoma, belonging to Tom Wallingford, Fitz-Lowe, Inc., and Layton Oil Company (defendants). The government argues that this award should be overturned because the commission increased the extent of taken property and permitted a total rather than a partial taking, despite the district court's contrary instructions. The government also argues that the commission's report contains speculative conclusions based on tenuous evidence. We hold that the commission neither allowed an increase in the taken estate nor diverged from the district court's instructions regarding severance damages. In addition, we conclude the commission did not abuse its fact-finding role and properly set forth its conclusions in its report. We therefore affirm the district court's order overruling the government's objections to the commission's award.
 
 I.
 
 2
 In the fall of 1979, the government filed complaints and declarations of taking subordinating defendants' mineral interests in 3,637 acres of the 5,633 acre Connelly Ranch in Bartlesville, Oklahoma. The government sought to obtain this interest to facilitate the construction of a Corps of Engineers' flood control project, which would result in the submergence of most of the ranch. In July 1983, a commission determined that all but 692 acres of the ranch had either been subordinated or affected by the project. The government presented valuation testimony of $326,000 and $441,000, while the landowners' experts valued the taking at nearly $11,000,000. The commission awarded the landowners $4,890,000, with one commissioner filing a minority report valuing the landowners' interests at $927,000. In reaching this award, the majority relied on the estimates of John Minton, one of defendants' expert witnesses, regarding the estimated future recoverable reserves and the future net cash flow for the more developed parts of the ranch. The commission based its assessment of the other, less tested, property on a $350 per acre purchase of the surface area and one-half of the mineral interest of part of the ranch in 1977. The commission estimated the area's present value at $600 an acre because the price of oil had increased nearly threefold from the date of this sale to the time the government filed its notice of taking.
 
 
 3
 The district court rejected the government's objections to the commission's findings. The court held the award appropriately reflected the fact that defendants had initiated a promising secondary recovery program involving the introduction of water under high pressure into an injection well. Defendants had to abandon this project when they heard their mineral interests would be subordinated because seepage from abandoned wells and dry holes could not be prevented once the area became submerged. The court also determined that the commission's report employed proper valuation methods and set forth enough relevant evidence to support the commission's findings. The government appeals this decision.
 
 II.
 
 4
 The government first argues that the commission erred in increasing the taken area. The government notes that its declarations of taking specifically set aside only 3,637 acres of the ranch. The United States did not request the right to subordinate oil and gas interests on any of the remaining area. Yet the commission, according to the government, determined just compensation for over 4,900 acres, sparing only 692 acres, and therefore impermissibly expanded the subordinated estate. The government argues that the extent of property to be taken rests wholly in the legislative branch. See Berman v. Parker, 348 U.S. 26, 35, 75 S.Ct. 98, 104, 99 L.Ed. 27 (1954).
 
 
 5
 When reviewing a commission report, the proper test is whether the trial court correctly determined the commission's award was not clearly erroneous. E.g., United States v. 46,672.96 Acres of Land in Dona Ana, et al., Counties, N.M., 521 F.2d 13, 15 (10th Cir.1975). A trial court has committed a reversible error in adopting the commission's conclusions only if the commission misapplied the law or made findings contrary to the clear weight of the evidence. United States v. 77,819.10 Acres of Land in Socorro and Catron Counties, N.M., 647 F.2d 104, 109 (10th Cir.1981), cert. denied, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 441 (1982). A court of appeals will not retry the facts, and a determination by the commission based on sharply conflicting evidence should be viewed as conclusively binding. United States v. 1,606 Acres of Land in Texas County, Okla., 698 F.2d 402 (10th Cir.1983); Wilson v. United States, 350 F.2d 901, 905 (10th Cir.1965).
 
 
 6
 We hold that the government does not make the requisite showing to warrant reversal. It is axiomatic that a landowner is entitled to compensation that will place him in as good a position as he would have occupied had his land not been taken. E.g., United States v. Miller, 317 U.S. 369, 373, 63 S.Ct. 276, 279-280, 87 L.Ed. 336 (1943). We have held on several occasions that fully compensating a landowner in a condemnation suit requires a consideration of the diminution of value of property not expressly taken. In Stipe v. United States, 337 F.2d 818, 821 (10th Cir.1964), for example, we held that when there is a taking of part of a tract of land, just compensation includes damages to the remaining property caused by the taking. Similarly, in United States v. 20.53 Acres of Land in Osborne County, Kan., 478 F.2d 484 (10th Cir.1973), one of the few cases cited by the government for the proposition that the extent of an interest to be acquired is not to be expanded by judicial fiat, we stated: "(I)t is equally clear and elementary that where part of a single tract is taken, the owner's compensation for that taking includes any element of value arising from out of the relation of the part taken to the entire tract...." Id. at 487.
 
 
 7
 A careful reading of the record indicates that the commission merely determined that the entire area, including most of the area not subordinated, was affected by the project. The landowners offered extensive expert testimony showing that oil and gas production could not be achieved on nearly the entire ranch once the government's project commenced. The commission reasonably relied on this testimony in determining that 1,300 additional acres of the ranch were "affected or subordinated by reason of the Government's project and the subordination of the minerals which it has actually taken." Report of the Commission, p. 8 (emphasis added). Therefore, the court did not err in upholding the commission's decision to compensate the landowners for the diminution of value of the nonsubordinated affected area, as well as for the expressly condemned property.[1]III.
 
 
 8
 The government also makes the related argument that the commission failed to follow instructions from the district court to use the theory of severance damages, even though compliance with a district court's instructions is clearly required by the Supreme Court's holding in United States v. Merz, 376 U.S. 192, 197, 84 S.Ct. 639, 642, 11 L.Ed.2d 629 (1964). The district court instructed the commission that compensation should be measured by the difference between the fair market value of the entire unit before the taking and the fair market value of the remainder after the taking. Despite these instructions, the government argues, the commission did not consider the value of the entire unit less the value of the acreage taken but instead simply awarded damages for a taking of the mineral interest underlying almost the entire ranch.
 
 
 9
 We disagree. Severance damages are necessarily considered when the fact-finder determines the before and after value of the entire tract. As the court noted in United States v. 91.90 Acres of Land in Monroe County, Mo., 586 F.2d 79, 86 (8th Cir.1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979): "It is incorrect to think of 'severance damages' as a separate and distinct item of just compensation apart from the difference between the market value of the entire tract immediately before the taking and the market value of the remainder immediately after the taking." See also United States v. 20.53 Acres of Land in Osborne County, Kan., 478 F.2d at 487 (when part of a tract is taken, severance damages simply measure the effect of the taking on the entire estate).
 
 
 10
 We hold that the commission did consider severance claim damages when it evaluated the overall effect of the government's project on defendants' property. After weighing expert testimony and reviewing the several detailed studies, the commission reasonably determined that the flooding of part of the ranch made it impossible to develop oil and gas reservoirs on all but 692 acres of the property. Report of the Commission, p. 9. Consequently, the commission found that the remaining area had no value for the development of oil and gas production after the taking. Although the commission did not expressly compare the value of the ranch before and after the taking, it in fact made this determination when it awarded its estimate of the value of the potential oil and gas reserves to the defendants. It is true that the commission somewhat elliptically omitted any discussion of the 692 acres unaffected by the Corps of Engineers' project. This part of the property, though, was incidental to the valuation of the affected estate, since its value before and after the taking remained the same.
 
 IV.
 
 11
 The government next argues that the district court committed reversible error by affirming an award of compensation based on very speculative evidence.[2] The government in particular criticizes the commission's reliance on Mr. Minton's testimony and its rejection of the testimony of two government expert witnesses. According to the government, Mr. Minton employed a questionable methodology which derived forecasts of future income by dividing the more tested areas of the property into four categories that only vaguely reflected the probability of the existence of oil deposits. Mr. Minton said during cross-examination that he knew of no one else in Washington County who used his method to determine what an operator would pay for an oil lease. Mr. Minton also admitted "it is not a certainty that those reserves can and will be produced."
 
 
 12
 The government also argues that the commission should not have rejected the testimony of the two government experts. According to one expert, Charles Ellis, nearly eighty gas wells had been drilled on the property, and evidence from this drilling suggested that no more primary reserves existed. The government believes Mr. Ellis adhered to a more accepted method of estimating the value of undeveloped land by using lease bonuses offered in the area to determine fair market value. Mr. Romine, the other expert, testified that Mr. Minton's method contained too many uncertainties and should never have been used to determine the value of undeveloped acreage. While the government admits the commission had the discretion to value one expert's testimony over another's, it argues that the commission should not have completely ignored its experts' testimony.
 
 
 13
 We hold that these arguments do not meet the "clearly erroneous" standard. As mentioned, commission findings derived from conflicting evidence are binding on a court unless a clear mistake has been made. E.g., United States v. 1,606 Acres of Land in Texas County, Okla., 698 F.2d at 405. No such mistake exists here. The record indicates that the government's experts ignored considerable information and relied on inadequate data. For example, they did not consider highly relevant waterflood recovery data on nearby tracts with comparable geologic characteristics. In addition, the two government's experts assumed that if oil existed on the property, it would already have been drilled. As the defendants point out, though, the price of oil increased by a factor of at least ten between the last significant development activity on the property and the time of the taking.
 
 
 14
 The record also supports the commission's determination that Mr. Minton employed the accepted net income calculation and considered an impressive amount of information. Mr. Minton evaluated isopac and structure maps showing the thickness and elevation of certain formations; drillers' logs for the approximately 120 wells on the ranch, most of which supplied natural gas; the results of pilot waterflood projects on several zones on and surrounding the property; and industry statistics of drilling success in the Oklahoma area.[3] Following industry procedure, Mr. Minton used this information to calculate the amount and the value of the oil and gas that could be extracted from each reservoir. He then deducted the various projected production costs, discounted this net value by a risk factor reflecting uncertainties, such as the possibility of dry holes, and further discounted this sum to its present value.
 
 
 15
 Mr. Minton's valuation technique did not produce a flawless estimate of potential oil production. Indeed, the commission accepted his valuation for only two producing zones on the property and determined that the other three zones had little chance of producing oil or gas. Yet some speculation and uncertainty is inevitable in determining the value of minerals in place. United States v. 79.95 Acres of Land in Rogers County, Okla., 459 F.2d 185 (10th Cir.1972). As the Supreme Court has noted, the "assessment of market value [of condemned property] involves the use of assumptions, which makes it unlikely that the appraisal will reflect true value with nicety." United States v. Miller, 317 U.S. at 374-375, 63 S.Ct. at 280-281.
 
 
 16
 Furthermore, we have held in a number of cases that in the absence of comparable land or mineral interest sales, it is appropriate to use the net income approach which Mr. Minton employed to estimate the profit a mineral interest could yield over a period of time. E.g., United States v. 179.26 Acres of Land in Douglas County, Kan., 644 F.2d at 367; United States v. Corbin, 423 F.2d 821 (10th Cir.1970). In United States v. 179.26 Acres of Land in Douglas County, Kan., for example, we upheld an award to landowners in a condemnation proceeding based on their experts' net value calculation. These experts estimated the potential income from the sale of the limestone over a period of time and discounted that income to its present value. These experts considered the amount and value of the limestone underlying portions of the property, the local demand for limestone, and possible production costs in extracting the limestone from the quarry. We stated that lacking evidence of prior sales of comparable rock quarries, this estimate of the net income from the best use of the land was an appropriate measure of value.[4] Id. at 372. Specifically, we noted:
 
 
 17
 (C)ourts have recognized that if the proof is not deficient, a present value for mineral interests taken in eminent domain proceedings may be determined by estimating the anticipated income that might be derived from the sale of the minerals over a period of time, and capitalizing that income in terms of its present worth.
 
 
 18
 Id. at 373.
 
 
 19
 The government and defendants reached very different valuation figures because the government's experts believed the property had value only for small amounts of primary production. The defendants' experts, on the other hand, argued that secondary recovery, which Layton Oil specialized in, could have yielded a great deal of oil if part of the property had not been submerged. Because of this disparity of opinion, the commission's award was likely to dramatically diverge from the estimates of at least one party. Yet mere dissatisfaction with the result does not prove error. The commission's decision to rely upon defendant's valuation of two of the five producing zones was certainly not an abuse of its discretion, especially since the record indicates that Mr. Minton adhered to the accepted net value calculation and thoughtfully considered an impressive variety of information.
 
 V.
 
 20
 Finally, the government states that the commission's report contained only conclusory findings, contrary to the Merz requirement that a report set forth enough important facts to provide guidance as to how a commission reached its conclusions. The government points in particular to the commission's findings that their experts provided the least valuable testimony and its conclusion that the Corps of Engineers' project precluded oil and gas development on nearly the entire ranch. The government asks us to rely on our decision in United States v. 20.53 Acres in Osborne County, Kan., 478 F.2d at 487, in which we refused to "fabricate a bridge" between vague references to testimony in the report and the commission's conclusions.
 
 
 21
 The Court in Merz, however, specifically did not require a commission to make detailed findings such as judges must do when they try a case without a jury. Merz, 376 U.S. at 199, 84 S.Ct. at 643. A commission need not set out "an array of findings of subsidiary facts to demonstrate that the ultimate finding of value is soundly and legally based." Id. Nor must a report be immune from all criticism that can be advanced by dissatisfied counsel, explain the exact thought processes of the commission, or apply a mathematical formula that can be programmed and then reviewed by the district court like an algebraic equation. United States v. 573.88 Acres of Land in Crawford, et al., Counties, Ind., 531 F.2d 847, 849 (7th Cir.1976); United States v. 403.14 Acres of Land in St. Clair County, Mo., 553 F.2d 565, 570 (8th Cir.1977). Rather, a commission simply has to distinctly mark its path through the maze of conflicting evidence. Merz, 376 U.S. at 198, 84 S.Ct. at 643; 20.53 Acres of Land in Osborne County, Kan., 478 F.2d at 487.
 
 
 22
 The commission's report meets this requirement. The report, which is fourteen pages with two additional pages of calculation, is a detailed, factual, and clearly reasoned document. It briefly discusses the content of the testimony and gives the commission's reasons for adopting and rejecting different expert's statements.[5] Furthermore, unlike the report at issue in United States v. 20.53 Acres in Osborn County, Kan., the report in the instant case does not simply refer to the record but instead indicates how the commission arrived at the award, the standard of valuation used, and the reasoning supporting its conclusion. Although the commission did not recite the various theories of calculation which could have been applied, we have held that this discussion is not required for a report to be deemed adequate. United States v. Evans, 380 F.2d 761, 765 (10th Cir.1967). In conclusion, we think the report indicates the factual basis for its findings and clearly marks the path that the commission followed in arriving at its decision. The district court's judgment is accordingly affirmed.
 
 
 23
 AFFIRMED.
 
 
 
 *
 The Honorable Aldon J. Anderson, United States District Judge for the District of Utah, sitting by designation
 
 
 [1]
 Our holding that the commission did not expand the taken property beyond the estate described in the declarations of taking disposes of the government's claim that the commission allowed defendants to make an impermissible counterclaim against the government. As the government notes, such counterclaims are barred because the United States is immune from suit without its consent. E.g., United States v. Sherwood, 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941). Because the commission did not interfere with the extent of the condemned interest, but instead simply measured the effect of the actual taking on the remainder, we believe the district court did not allow defendants to assert a counterclaim
 The several cases cited by the government on this point are distinguishable from the instant case. In United States v. 101.88 Acres of Land in St. Mary Parish, La., 616 F.2d 762 (5th Cir.1980), the court held that the dumping of dredge soil on submerged land not expressly taken by the government could only be compensable in a separate proceeding. The court, though, distinguished this "separate physical invasion of the remainder" from a diminution in value of the remainder caused by the use of the taken land, which entitles the landowner to additional compensation in the condemnation proceeding. United States v. 3,218.9 Acres of Land in Warren County, Pa., 619 F.2d 288 (3d Cir.1980), cert. denied, 449 U.S. 872, 101 S.Ct. 212, 66 L.Ed.2d 92 (1980), is also distinguishable. In 3,218.9 Acres, the court held that landowners who feared their future drilling on forest land taken by the government might be "inhibited" by federal regulation alleged only a possible future taking of property which did not give rise to a present cause of action for damages. The court emphasized that the defendants holding subsurface rights "retained the same conditions and rights after the taking as they possessed previously." Id. at 291. These cases indicate that the landowners in the instant case are entitled to compensation in the condemnation proceeding for the relatively nonspeculative diminution in value to the remaining land that resulted from the flooding of the condemned property.
 
 
 [2]
 The government makes a cursory argument that the commission improperly used a prior purchase of the Fitz-Lowe interest to determine the value of the less tested areas of the ranch. As the district court noted, this sale, which occurred two years before the taking, was the only remotely comparable sale presented in evidence by the parties. Comparable land sales are clearly the best measure of the value of a property. E.g., United States v. 179.26 Acres of Land in Douglas County, Kan., 644 F.2d 367 (10th Cir.1981). Furthermore, it is logical that the value of a property used for the production of oil and gas would increase proportionately with the market price of oil. The commission, therefore, did not err in either using this sale or in its extrapolation to determine the current value of the property
 
 
 [3]
 Tom Jones, another expert employed by the defendants, believed Mr. Minton's estimates were very conservative. Defendants point out that Mr. Jones' testimony is significant because his original evaluation of the property's potential for secondary oil recovery was prepared for Layton Oil Company long before commencement of this litigation. Mr. Jones estimated that a waterflood of the ranch would yield from 1,200,000 to over 2,000,000 barrels of oil, which in 1967 prices of less than $3 a barrel would result in a profit of between $1,500,000 and $3,000,000
 
 
 [4]
 This case carefully distinguishes between the suspect unit-times-price measure, which simply multiplies an estimated amount of a mineral by a set price, and therefore assumes a stable demand and ignores any element of risk, from the valid net value measure used by Mr. Minton. The net value measure requires a showing of market demand for the mineral, a more thorough proof as to the amount of mineral under the property, and a deduction for projected production costs and potential risks
 
 
 [5]
 Specifically, the report notes:
 That the least acceptable [testimony from the four experts] was the testimony of the Government's witness, Charles A. Ellis, a petroleum engineer, who ignored considerable data made available to him in arriving at some of his conclusions and who also relied on highly inadequate material in formulating some of the rest of them. The Commission chooses to ignore his opinion as to fair market value. The Commission also finds the testimony of the government witness, Romine, less than satisfactory. The theories employed by him did not seem to take into account much of the potential value of the ranch, and much of his opinion was predicated on facts or data of a scope too limited to be given the general application he put forward. The most acceptable expert testimony concerning fair market value was given by the defendant's witness, John Minton, a petroleum engineer, who based his conclusions upon an opinion as to future recoverable reserves in the various zones underlying the property, a proposed method of developing and producing those reserves, a projection of the future net cash flow, and a discounting of that future net cash flow to present worth.
 Report of the Commission, p. 9.